76,258-03

GUSTAVO L. MIRELES
3001 S. EMILY DR.
McCONNELL UNIT
BEEVILLE, TEXAS 78102

March 14, 2015

Texas Court of Criminal Appeals
Attn: Hon. Abel Acosta (Clerk)
P.O. Box 12308
Capitol Station
Austin, Texas 78711

RECEIVED IN
COURT OF CRIMINAL APPEALS
MAR 19 2015
Abel Acosta, Clerk

Dear Clerk:

If you could would you please be so kind and file this Application for Writ of Mandamus in the appropiate court.

If this application is not properly addressed, can you please be so kind and notify me and/or return the application with instructions to correct the error.

Thank you for your time and attention to this very important and urgent matter. Please notify me when filed.

Sincerly,

/s/ Gustavo L. Mireles

Gustavo L. Mireles

ENCLOSURES:
CC: File, Leonor Matano 580 Irene Dr., canyon-Lake, Texas 78133; she has "power of attorney".

This document contains some pages that are of poor quality at the time of imaging.

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS
## AT AUSTIN, TEXAS

GUSTAVO LOPEZ MIRELES            §

    APPLICANT                §

Vs.                              § NO _____

                                §

HIDALGO COUNTY DISTRICT ATTORNEY §
OFFICE, RENE GUERRA, AND THE     §
McALLEN TEXAS DEPARTMENT OF      §
PUBLIC SAFETY DNA CRIME FIELD
LABORATORY SEROLOGIST ORLANDO    §
OCHOA, 139TH DISTRICT COURT
JUDGE BOBBY FLORES
    RESPONDENTS              §

This document contains some pages that are of poor quality at the time of imaging.

## Motion for Leave to File Application
## For WRIT OF MANDAMUS

TO THE COURT OF CRIMINAL APPEALS OF TEXAS:

NOW COMES, Gustavo Lopez Mireles, applicant, complaining of, District Attorney Rene Guerra, and Serologist Orlando Ochoa, respondents and pursuant to Rule 52.1 of the Texas Rules of Appellate Procedure (former Rule 211) in Criminal Cases, moves this court to grant leave to file this application for a writ of mandamus tendered contenpuraneously with this motion.

Applicant prays that the Motion be granted, the said application for Mandamus be filed and set down for a hearing, that the relief requested be granted, general and special, including a stay of proceedings below until the matters complained of in said application are cured.

Respectfuly Submitted

/s/ _Gustavo L. Mireles_

Applicant Pro-se

Gustavo L. Mireles
TDCJ-ID #1128895
3001 S. Emily Dr.
McConnell unit
Beeville, Texas 78102

### CERTIFICATE OF SERVICE

I hearby certify that a copy of the above Motion for Leave to file application for Writ of Mandamus was delivered or mailed to Respondent at Respondent's adress, on this day 14 of March 2014.

/s/ _Gustavo L. Mireles_

Aplicant Pro-se

GUSTAVO LOPEZ MIRELES

    APPLICANT

§

Vs.

§ NO _____

HIDALGO COUNTY DISTRICT ATTORNEY
OFFICE, RENE GUERRA, AND THE    §
McALLEN, TEXAS DEPARTMENT OF
PUBLIC SAFETY DNA CRIME FIELD  §
LABORATORY SEROLOGIST, ORLANDO
OCHOA, 139TH DISTRICT COURT    §
JUDGE BOBBY FLORES
      RESPONDENTS          §

---

## APPLICATION FOR MANDAMUS

TO THE HONORABLE COURT OF CRIMNAL APPEALS OF TEXAS:

NOW COMES, Gustavo Lopez Mireles, applicant, and asks this court to issue a Writ of Mandamus to Hidalgo County Texas District Attorney's Office, and McAllen, Texas Department of Public Safety DNA Crime Field Laboratory serologist, Orlando Ochoa, respondents, to require respondent describe relief requested and in support of this application would show this court the following; concerning Motion for Court of Inquiry and motion for Diclosure.

I.
### FACTUAL BACKGROUND

Applicant filed a motion to conduct a Court of Inquiry on June 10, 2014. The motion was denied due to lack of substancial facts to establish probable cause for conducting a Court of Inquiry on August 14, 2014. (See attached Exhibit-A).Applicant's motion consists of overwhelming substancial facts that in the "Intrest of Justice" establish "Probable Cause", to Conduct the Court of Inquiry requested, in Trial Cause No. CR-3196-01-F.

(a) The Legislature of Texas in April 1, 2001, enacted laws to govern all Texas Department of Public Safety DNA Crime Field Laboratories analytical standards for quality assurance and proficency testing for forensic DNA analysis on criminal cases.

1

(b) The Texas Department of Public Safety DNA database must and had to be compatible with the national identification index system (CODIS) used by the FBI to the extent required by the FBI to permit the useful exchange and storage of DNA records or information derived from those records.

(c) The Texas Department of Public Safety Crime Field Laboratories were required by Texas Lagislative Law, to establish standards for DNA analysis by any of it's DNA laboratories that meet or exceeded the quality assurance standards issued by the FBI.

(d) If this quality assurance standards were not met, the director of the laboratory in violation of these standards as established by Legislative Law, was obligated to prohibit the laboratory from exchanging DNA records or analysis with another DNA laboratory or criminal juestice or law enforcement agency.

(e) The record shows this honorable court, that the quality assurance standards when testing DNA forensic analysis, issued by the FBI were not met or exceeded, in this instant case. The standards utilized by the McAllen Department of Public Safety DNA Crime Field laboratory and it's serologist Olando ochoa, did not even come close to the standards issued by the FBI.

(f) The offnese charged to the Appellant of First Degree Murder, had not even taken place yet. The appellant was charged with the offense by indictment to have been commited on or about June 23, 2001, 8 moths after the Texas Legislature enacted these DNA analytical mthodology standards, and they're requirments.

(g) Appellant was entiltled by due process constitutional right the right to have these Texas Laws applied to the DNA analysis of this instant case. (Trial Cause No. CR-3196-01-F).

(h) Every agency that is established in the State of Texas, must abide by Texas Laws. If any agency violates this Laws and causes harm to another in the process, that agency commits a crime against the State of Texas; pursuant to the Texas Penal code.

(2) Denial to conduct the Court of Inquiry was recived from the 139th district court on August 22, 2014, through TDCJ McConnell Unitm, 3001 S. Emily Dr., Beeville, Texas, Mail room service. Appellant's motion to conduct the Court of Inquiry was not addressed to be filed in the 139th district court, but instead to the 206th district court, where judge Rose Guerra Reyna is the presiding judge. (see attached exhibit-A). Appellate Clerk Alexandra Gomes, took it upon herself, in violation of the TCCP. Art. 2.21, and filed the motion in the 332nd district court, where accused defendant Mario Ramirez Jr. presides; after the Appellant inquired of the motion's desposition, through the appellant's sister, Leonor Matano, 580 Irene Dr. Canyon-Lake, Tx.

2

## II.
## REQUEST FOR RELIEF

Applicant asks this Honorable court to issue a Court Order pursuant to this "Ministrial Act", for the Court of Inquiry to be conducted. Crimes have been committed against the State of Texas and against the applicant, by the Respondent's failure to uphold the laws enacted by the States Legislature.

## III.
## JURISDICTION

This court has jurisdiction to consider this application pursuant to Art. 5,5 of the Texas Constitution and Art. 4.04 of the Code of Criminal Procedure; to include Art. 1.04,1.05.

## IV.
## AUTHORITIES AND ARGUMENT

On December 12, 2001 State's Forensic expert, serologist Orlando Ochoa of the McAllen, Texas D.P.S. Crime Field Laboratory conducted a DNA analysis concerning the Capitol Murder of victim Mary Jane Rebollar; and comparing the DNA left behind at the crime scene to the Applicant's DNA sample. Analyst Orlando Ochoa on August 6, 2001, testified at trial 332nd district court; that for a basis for his DNA analysis of the case he had used the Combined DNA Index System (CODIS), national DNA database computer system. (See attached exhibit-B RR. Vol 9. pgs 20-21).

The DNA Database System that state expert analyst Orlando Ochoa was refering to was the DNA Database System in SUBCHAPTER G. of the Executive Brabch Department of Public Safety Title 4 Ch. 411. By analyst Orlando Ochoa, utilizing the CODIS DNA Database System to conduct the DNA analysis of this case, he was obligated and required pursuant to section § 411.142 (a) through (h) to conduct the DNA analysis to either meet or exceed the current standards for quality assurance

3

and proficiency testing for forensic DNA analysis issued by the Federal Bureau of Investigation, (FBI). (See attached exhibit B-2)

Orlando Ochoa, was further required to ensure that the DNA database was compatible with the national DNA identification index system (CODIS) or Combined DNA Index System, used by the FBI to the extent required by the FBI to permit the useful exchange and storage of DNA records or information derived from those records, concerning the investigation of a crime, regard-- less of orgin. (See attached exhibit B-3 at (b) (f) (g) (h), This subchapter G. of the DNA Database system was Added by Acts of 1995, 74th Legislature Ch. 595, § 1. eff. Sept 1, 1995. Amended by Acts 2001, 77th Leg. Ch. 2, § 4, eff. April 5, 2001. Orlando Ochoa conducted the DNA analysis in this instant case in December 12, 2001, eight months after the Legislature enacted this laws. The DNA analysis in this instant case were subject to these requirments, set by the FBI CODIS,

In order to meet or exceed the FBI's quality assurance and proficiency DNA testing for forensic DNA analysis, the DNA protocols and standard operating procedures require a finding and search at a minimum of 13 defrent loci, from the crime scene DNA samples to a suspect's DNA sample. This 13 Core CODIS loci search and match must be met, in order for Orlando Ochoa to conclude and testify at trial that he had made a, " Consistant Match", a "Source attribution Match", a Positive Match", a "Randum Match Probability". However, Orlando Ochoa testified under oath at trial that he only searched for 9 loci, and compared only 9 loci from the crime scene DNA to the appellant's DNA sample, Further, he testified that he had only been able to match 2 to 3 loci from both samples, when conducting the analysis. (See attached exhibit-B pgs 23-24).

4

Orlando Ochoa, further testified that concerning skin samples, blood, that had been embedded underneath the victim's Mary Jane Rebollar's fingernails, that because he had managed to match 2 loci,, he told the jury, that this DNA belonged to the victim, instead of some other person. (See attached exhibit-B-? pgs 25-26), The Appellant was excluded as being the contributor to that DNA, Orlando Ochoa knew about the 13 CODIS core loci requirment, because he testified that it was not uncommon for DNA analyst to look at the 13 regions to make it more specific to an individual. (See attched exhibit-B at pg 32). It didn't matter to Orlando Ochoa, if he was complying with the DNA data-base requirments or not, if he matched only 2 loci, to him it was a match, and that was that. (See attached exhibit-B at pg 34-35). It is clear and convincing that Orlando Ochoa knew about the requirments set forth by the FBI which require a match of 13 diffrent loci from the crime scene DNA to the appellant's DNA sample, in order to testify that he made a match. It is clear and convincing that Ochoa, choose not to follow standard operating procedures. He utilized the DNA Database System, but instead of following protocol, set his own DNA analytical guidelines in violation of legislative laws.

(4) Due to the reasons stated above, the appellant further contested in his motion that Orlando Ochoa had committed crimes against the state of Texas. (1) Aggravated Perjury Texas Penal Code § 37.03, (2) False Report to a Peace Officer or Law Enforcement agency, Texas Penal Code §37.08, (3) Tampering With or Fabricating Physical Evidence, Texas Penal Code § 37.09. (a), (1) (2).

5

(4) Tampering With a Goverment Record, Texas Penal code § 37.10. (a) (1) (2) (3) (4) (5) (6). Orlando Ochoa, committed such crimes against the state of Texas when he knowingly made the false entry and alteration of a goverment record, when he submitted as reliable evidence his DNA analysis of this instant case, knowing that it was fruadulent, and misleading. He further knew that his DNA analysis did not meet or exceed the FBI's CODIS national Index system's quality assurance and proficiency DNA testing forensic standards, but he still choose to testify at trial that his analysis were true and correct. Ochoa's trial testimony and DNA test results are the only evidence that the state relied upon to obtain this instant conviction.

The McAllen Texas DPS Crime Field Laboratory, and it's directors Thomas A. Davis jr., Frankie Waller, and David Mceathron, knew or should have known before authorizing the release of this fruadulant, incriminating, DNA test results, conducted by Orlando ochoa, were fruadulent, misleading, and not in compliance with CODIS FBI's standard Operating procedures. By allowing the exchange of these records, they all became acomplices, of said crimes against the state of Texas pursuant to Texas Penal Code § 43.06. (a) (b) (c) (d).

District Attorney Rene Guerra and trial Judge mario Ramirez Jr, committed the offense of Abuse of Official Capacity, pursuant to the Texas Penal code § 39.02. and § 39.03. (a) (1) (2), Both District Attorney Rene Guerra and Mario Ramirez Jr, trial judge, should have known as a matter of law, when hearing Orlando Ochoa's

6

fruadulant and delibrate misleading DNA test result's testimony, that his DNA test result's were inadmissable pursuant to the Texas Legislature's enactted laws. Both of them, failed to act, and instead allowed the appellant Gustavo L. Mireles to be convicted soley on this DNA test results provided by Orlando Ochoa, the State's "Hired Gun". Appelant was convicted to Life in prison, based on fruadulent, faulty, unreliable, unacceptable by the forensic science community then when the tests were conducted in Dec 12, 2001 or now, "Junk Science". (See attached exhibit B-6 Newly acquired evidence).

(4) LACK OF JURISDICTION TO ENTER RULING:

Judge Bobby Flores of the 139th District court of Hidalgo County, Texas , when he first recived this motion, through "Tootsie", secretary of judge Mario Ramires Jr, at the 332nd criminal district court, on or about August 3, 2014, review and entertained said motion, and decided to submitt said motion to administrative judicial district judge Rolando Olvera. Pursuant to the Texas Code of Criminal Procedure Art 52.01 (a), judge Flores in order to submitt the motion to judge Olvera, had to first belive that the motion consisted of "probable Cause" that a crime against the state of Texas had been committed.

The decision of judge Bobby Flores to request and submitt the motion to Rolando Olvera, implicates, substancial facts had been establi3hed for requesting judge Olvera to asign a judge to commence the Court of Inquiry. Administrative judicial judge Rolando Olvera, returned the motion back to judge Bobby Flores, on or about August 11, 2014. Pursuant to the TCCP. Art. 52.01. the fact that this instant motion was entertained by the administrative judicial district judge, implicated that by him

7

reciving the motion and submitting it back to judge "Bobby" Flores, was for the judge Bobby Flores to comence the Court of Inquiry, and not to order that the Court of Inquiry not be conducted; as he did in his court order ruling issued in August 14, 2014. Furthermore, judge Flores lacked jurisdiction to enter a ruling pursuant to Texas Code Criminal procedure Article 52.01 (b) (2), because he was the requesting judge.

It was District Attorney Rene Guerra himself that opened the "Gateway" to this Court of Inquiry. In March 15, 2004, Rene Guerra was notified that an audit conducted by the Department of Public Safety cited the McAllen, Texas Crime Field Laboratory with numerous DNA analytical policies and procedural problems. The audit caused the Laboratory's closure. The laboratory had been using outdated Standard Operating Procedures, then the ones currently adopted by the Texas Legislature. The laboratory's director claimed that they were given permission, because they were "Grandfathered". ReneGuerra said that the Department of Public Safety had to itemize the cases that had been effected by the laboratory's closure. Especially the cases where DNA had played a major role in the state obtaining a conviction. More then 300 cases had to be re-evaluated. (See attached exhibit B-4). Because the DNA evidence was the only evidence that the state had relied upon to obtain the conviction in cause No. CR-3196-01-F; Applicant had and has a constitutional right to be notified if his case was within the 300 cases that were re-evaluated. Furthermore, what analytical DNA forensic analysis procedures were utilized in the re-evaluation process. Applicant has motioned the district attorney's office for disclosure of said issue and that motion has also been denied. (See attached exhibit A-5).

8

Both motion to conduct a "Court of Inquiry" and 'motion for Disclosure", have been appealed to the 13TH court of Appeals. (see attached exhibit B-5). In the motion to conduct a court of Inquiry, the Court of Appeals has entered an Opinion and judgement saying that, "A party may appeal only that which the Texas Legislature has authorized". Further saying that, "TCCP. Art. Ch. 52 does not provide for an appeal to a district judges determination in a motion to conduct a Court of Inquiry. Both decisions from the Court of Appeals are erronious because:

A. the court has decided an important question of State and federal law that has not been, but should be settled by the Court of Criminal Appeals.

B. The court has decided an important question of State and Federal Law in a way that conflicts with the applicable decisions of the Texas Legislature's laws that govern the land.

C. the court has declared a statute, rule, and ordiance to in the "Intrest of Justice" review, be unconstitutional, and appears to have overlooked the statutes under the "color of law".

D. The justices of the Court of Appeals have disagreed in a material question of law necessary to the court's decision.

F. The court of appeals has departed from the accepted and usual coarse of judicial proceedings and has sanctioned such a departure by a lower court, which calls an exercise of the Court of Criminal Appeals' power of supervision.

Applicant asserts that the Texas Legislature, (like argued) priorly, authorized in April 5, 2001, that all Texas DPS Crime Field laboratories utilize quality assurance DNA testing standard that either meet or exceed the FBI's Combined DNA Index System issued by the FBI. The court of Appeals has dismissed the motion to conduct a Court of Inquiry saying that the applicant could only appeal "that which Texas Legislature has authorized". Well, the motion, contested that the state did not apply to this instant case, CR-3196-01-F State of Texas vs. Gustavo L. Mireles the DNA analitical standards authorized by the Texas Legislature;

9

therefor, making the issue appealable. Furthermore, nowhere in the Texas code of Criminal Procedure Chapter 52, does it state that a district judge's determination on a motion to conduct a Court of Inquiry, is not appealable. (See TCCP. 2012 Ed.).

The Court of Appeals ruled that all other motions pending were dismissed as moot. This without even looking at the motion for Disclosure, which consisted of a diffrent issue which was also of constitutional magnatude.

Not only does the Court of Appeals decision violates and is contridictory to the State of Texas enacted legislative laws, but it also violates the United States constitutional Amendments 5th,6th and 14th due process clause. This violations rise to a funda- mental defect which inherently results in a complete miscarriage of justice and is inconsistent with the rudimentary demands of fair procedure.(See, Cockerham V. Cain, 283 F. 3d 657,663 (5th Cir. 2002).

The dismissal in both the district court and the court of appeals opinions and judgements, are actions done under color of law, which are done with the apparent authority of the law, but actually in contrevention of the law. A Federal Cause of action may be maintaned against a state officer who under color of law deprives a person of his civil rights. 42 U.S.C. §1983.

The matters and issues presented to both courts are so "Plain" that the errors are "clear" and "obvious" and affect the applicant's substantial rights, this errors seriously affect fairness, integrity and public reputation of the judicial proceedings. (See U.S. v.Kirk, 528 F. 3d 1102, 1110 (8th Cir. 2008), (See also, FED. R. CRIM. P. 52 (b).)

In both cases Court of Inquiry motion, and motion for Disclosure, the records clearly show that the Respondents/or Defendants never filed any type of response or refuted the assertions and alligations contained therein. Pro-se alligations are accepted as true, unless they are clearly frivolous.(see, United States v. Baynes, 622 F. 2d 66 (3rd Cir. 1980). Furthermore, when the State fails to despute the facts contained in a Petitioner's pro-se alligations, it essentially admits those alligations. (see, Bland v. Dept. of Corrections, 20 F.3d 1469 (9th Cir. 1994), See also, In re Sixto, 48 Cal. 3d 1247, 259 Cal. Rptr 491,492, 774 P. 2d 164, 165 (1989), See also, Earp v. Stokes, 423 F. 3d 1024 (9th Cir. 2005). The Applicant/Petitioner has shown to this Honorable Court a 'Colorable Claim" where he has alleged specific facts that are true, which entitle him to relief, unless the alligations are clearly frivolous. See, Morre v. United states, 571 F. 2d 179, 184 (3d Cir. 1978).

The Applicant/Petitioner has presented to this Honorable Court compelling evidence that substanciates that Crimes against the State of Texas have been clearly comitted. The Supreme Court has held in "Brady" that the supression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution". 373 U.S. at 87. there after the Court held that such disclosure is mandatory regardless of whether a defendant requests it, United States v. Agurs, 427 U.S. 97, 107 (1976), and that impeachmnet evidence must also be disclosed, see Brady 473 U.S. at 676; Giglio, 405 U.S. at 154.

11

Applicant has obtained "newly Discovered Evidence" in the form of two highly qualified forensic analysts who are expert in the forensic field. Hary j. Bonell M.D. and John Plunkett M.D. have both provided affidavit and a letter substanciating that the DNA analysis conducted by state analyst Orlando Ochoa in December 12, 2001 were defective and misleading and below the acceptable forensic community standards, then and now. (See Exhibit-B-6).

V.
### CONCLUSION

(1) Applicant has no legal remedy available to him other then this application for writ of mandamus.

(2) This action sought, under the facts of this case, in essence, a ministrial act which respondent had legal duty to preform.

(3) Applicant has properly requested repondent to preform, which repondent has refused.

WHEREFOR, PREMISSIS CONSIDERED, Applicant prays that this application be granted and that the respondent be ordered to continue with the relief requested.

Respectfuly Submitted,

/s/ _Gustavo L. Mireles_

Aplicant Pro-se
Gustavo L. Mireles
TDCJ-ID #1128895
3001 S. Emily Dr.
McConnell Unit
Beeville, Texas 78102

### INMATE DECLARATION

I, Gustavo L. Mireles, presently incarcerated at the Texas Department of Criminal Justice Division, McConnell Unit, located at 3001 S. Emily. Dr , Beeville, Texas 78102, have carefuly read the foregoing insturment and find same to be true and correct, in all things therein, to the best of my knowledge.

Signed this ___ day of March, 2014

Respectfuly Submitted,

/s/ _Gustavo L. Mireles_

Applicant Pro-se
Gustavo L. Mireles

12

EHIBIT A CONSISTS OF:

1. Motion to conduct a court of Inquiry filed by the
   Hidalgo county Clerk's office; June 10, 2014

2. Court Order issued by 139th District court, presiding
   judge Bobby Flores.

3. Amanda and Macario Mireles's Texas General Affidavits,
   concerning the procedures taken in the instant motion as
   having personally been told to them by Alexandra Gomez,
   "Tootsie", and "Shila, secratary of the 139th district court

4  Leonor Matano's Texas General Affidavit, concerning the
   procedures taken in the instant motion, as told to her on
   and through telephone records, by Alexandra Gomez, 'Tootsie"
   and 'Shila, the secratary for the 139th district court.

5. Motion for Disclosure  filed May 30, 2014.

# AFFIDAVIT OF <u>AMANDA MIRELES</u>

STATE OF TEXAS         §
                                     §

COUNTY OF HIDALGO     §

        Before me, the undersigned authority, on this day personally appeared affiant <u>Amanda Mireles</u>, who proved to me to be the person whose name is subscribed to this Affidavit and who acknowledged to me that she executed the same, and after she was duly sworn, upon her oath, she deposed and said:

        My name is <u>Amanda Mireles</u>. I am 76 years of age, of sound mind and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

        On June 10, 2014, I went to the Hidalgo County District Clerk's office and I spoke to Sandra Gomez. I took her some documents that were to be delivered to Judge Rose Guerra Reyna. Sandra took those documents to her supervisor, Laura Hinojosa, and then the documents were sent to Judge Mario Ramirez. I specifically told Sandra that the papers were not for Judge Ramirez but rather for Judge Guerra Reyna because my son, Gustavo Mireles wanted for me to deliver them to Judge Guerra Reyna. Sandra took the papers to Judge Ramirez' office. A few days passed and they sent the papers to Judge Bobby Flores. Judge Flores' secretary reviewed the papers and then were sent to Cameron County and Judge Rolando Olvera. A few days later, the secretary told me that Judge Olvera returned the papers to Judge Bobby Flores, who was to make a decision on the documents.

_Amanda Mireles_ (signature)

Amanda Mireles

        SWORN TO and SUBSCRIBED before me by <u>Amanda Mireles</u> on this 29th day of August 2014.

<table>
<tr><td>

**NOTARY PUBLIC**
**Rick Puente**
State of Texas
My Commission Expires November 12, 2014

</td><td>

Notary Public in and for the State of Texas
My Commission Expires on
November 12, 2014.

</td></tr>
</table>

---

[1] Rick Puente-Notary Public: PO Box 1514, San Juan, TX 78589 (956) 782-8425

August 13, 2014

Innocence Project of Texas
1511 Texas Avenue
Lubbock, Texas 79401

RE: Gustavo L. Mireles Request for Criminal Inquiry filed Hidalgo CO. Courthouse on 7/10/14

Dear Nick or Attorney Jeff Blackburn,

Enclosed is a copy of the Inquiry filed by Gustavo. As you can see it was addressed to Judge Rosa Guerra-Reyna. When I called the courthouse for status, they informed they did not know what to do with it. The last inquiry they received was 30 years old.
The Trial Judge Ramirez had it, and then transferred to Judge Guerra-Reyna. She did not know what to do so she forward it to her superior
Judge Roberto "Bobby" Flores. Judge Flores sent it to District 5 Judge, Rolando Olvera whom sent it back to Judge Flores to process and address.

The inquiry has several elements, one the elements (DNA report and results) submitted to Jury was a "material misrepresentation", and such representation would induce a Juror or a reasonable person to alter the outcome of the verdict. Second this was "false representation" of the DNA. Third, misrepresentations were made knowing and recklessly with the intent. Fourth the trial Judge keeper of Justice and the DA knew the representation was false, made recklessly, as positive assertions, and without knowledge of the truth to Jury and were made with the intent to mislead the Jury and the outcome of the verdict, a criminal offence was committed. This is not common in this county.

Keep in mind, 5 sheriffs from the Rio Grande Valley including the Hidalgo Co. sheriff were convicted of criminal charges and some are serving prison sentences. As recent as a few months ago the Hidalgo Sherriff, his son (Leader of the Panama unit) and several of his top officials were indicated and are serving prison terms including a DA whom was helping them and there were many more.

We relied on the truth and they kept it from the Jury.

If the Inquiry results in a hearing, will you help us by representing Gustavo?

Please let me know so we can prepare.
Thank you,
Leonor Mata

Cc: Gustavo L. Mireles
Enclosures



## SYLVIA REYES
COURT COORDINATOR
139TH JUDICIAL DISTRICT OF TEXAS

100 N. Closner, 2nd Floor      Tel: (956) 318-2260
Edinburg, TX 78539      Fax: (956) 383-7608
     sylvia139th@yahoo.com

Judge Bobby Flor
Presiding Judge
139 th District (

318 - 2260

2nd floor



## J.R. "Bobby" Flores
Judge, 139th State District Court

Hidalgo County Courthouse
100 North Closner, Second Floor    Edinburg, Texas
Tel: (956) 318-2260



## Laura Hinojosa
Hidalgo County District Clerk

*Deputy District Clerk*

CR-3190-01-79

PO Box 87      Tel. (956) 3
Edinburg, Texas 78540      Fax (956) 3
     Email: districtclerk@co.hidalgo.tx.us

Case No. <u>CR-3196-01-F</u>

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 139TH DISTRICT COURT |
| | § | |
| | § | |
| | § | |
| VS. | § | OF |
| | § | |
| | § | |
| | § | |
| GUSTAVO LOPEZ MIRELES | § | HIDALGO COUNTY, TEXAS |

# ORDER

On this the 14th day of <u>August</u>, 20<u>14</u>, the Court having examined the pleadings, record, and the submitted transcripts, FINDS that there is lack of substantial facts to establish probable cause for conducting a Court of Inquiry.

IT IS THEREFORE ORDERED that a Court of Inquiry not be conducted

SIGNED AND ENTERED on this the 14th day of <u>August</u>, 2014

_____
LOCAL ADMINISTRATIVE JUDGE

CHIEF JUSTICE
  ROGELIO VALDEZ

JUSTICES
  NELDA V. RODRIGUEZ
  DORI CONTRERAS GARZA
  GINA M. BENAVIDES
  GREGORY T. PERKES
  NORA L. LONGORIA

CLERK
  DORIAN E. RAMIREZ



# Court of Appeals

## Thirteenth District of Texas

NUECES COUNTY COURTHOUSE
901 LEOPARD, 10TH FLOOR
CORPUS CHRISTI, TEXAS 78401
361-888-0416 (TEL)
361-888-0794 (FAX)

HIDALGO COUNTY
ADMINISTRATION BLDG.
100 E. CANO, 5TH FLOOR
EDINBURG, TEXAS 78539
956-318-2405 (TEL)
956-318-2403 (FAX)

October 09, 2014

Hon. Oscar Rene Flores
Attorney at Law
1308 South 10th Ave.
Edinburg, TX 78539
* DELIVERED VIA E-MAIL *

Hon. Rene A. Guerra
Criminal District Attorney
Hidalgo County Courthouse
100 N. Closner, Room 303
Edinburg, TX 78539
* DELIVERED VIA E-MAIL *

Re:        Cause No. 13-14-00497-CR
Tr.Ct.No. CR-3196-01-F
Style:     Gustavo Lopez Mireles v. The State of Texas

Enclosed please find the opinion and judgment issued by the Court on this date.

Very truly yours,

Dorian E. Ramirez, Clerk

DER:dsr
Enc.
cc:    139th District Court/Hidalgo County (DELIVERED VIA E-MAIL)
       Hon. Laura Hinojosa, District Clerk (DELIVERED VIA E-MAIL)
       Hon. J. Rolando Olvera Jr., Presiding Judge, 5th Administrative Judicial Region
       (DELIVERED VIA E-MAIL)

Case No. 13-14-00497-CR
Page 2

Very truly yours,

*Dorian E. Ramirez*

Dorian E. Ramirez, Clerk

DER:sc
cc:   Hon. Rene A. Guerra (DELIVERED VIA E-MAIL)
      Hon. Laura Hinojosa, District Clerk (DELIVERED VIA E-MAIL)
      Mr. Jessie Salazar, Court Reporter



# NUMBER 13-14-00497-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

GUSTAVO LOPEZ MIRELES, Appellant,

v.

THE STATE OF TEXAS, Appellee.

On Appeal from the 139th District Court
of Hidalgo County, Texas.

# MEMORANDUM OPINION

Before Chief Justice Valdez and Justices Garza and Longoria
Memorandum Opinion Per Curiam

Appellant, Gustavo Lopez Mireles, attempts to appeal an order issued on August 14, 2014, denying his request for a court of inquiry. We dismiss the appeal for lack of jurisdiction.

A court of inquiry is a criminal proceeding authorized by and conducted according to Chapter 52 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. arts. 52.01-.09. When a district judge, acting in his capacity as magistrate, has probable cause to believe that an offense has been committed against the laws of this state, he or she may request that the presiding judge of the administrative judicial district appoint a district judge to commence a court of inquiry. TEX. CODE CRIM. PROC. art. 52.01(a). The appointed judge may summon and examine any witness in relation to the offense in accordance with the procedural rules established in Chapter 52. *Id.* If it appears from a court of inquiry that an offense has been committed, the judge shall issue a warrant for the arrest of the offender as if the complaint had been made and filed. TEX. CODE CRIM. PROC. art. 52.08.

A party may appeal only that which the Legislature has authorized. *Olowosuko v. State*, 826 S.W.2d 940, 941 (Tex. Crim. App. 1992); *McCarver v. State*, 257 S.W.3d 512 (Tex. App.—Texarkana 2008, no pet.). Chapter 52 does not provide for an appeal from the judge's determination. *In re Court of Inquiry*, 148 S.W.3d 554, 555 (Tex. App.-El Paso 2004, no pet.). Accordingly, this appeal is DISMISSED for lack of jurisdiction. All pending motions are DISMISSED as moot.

PER CURIAM

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
9th day of October, 2014.

2

GUSTAVO L. MIRELES
TDCJ-ID # 1128895
3001 S,. EMILY. DR.
McCONNELL UNIT
BEEVILLE, TEXAS 78102

June 16, 2014

Honorable District Clerk
of Hidalgo county Texas
Attn: Laura Hinojosa
1ST FLOOR COURTHOUSE
100 N. CLOSNER BLVD.
P.O. DRAWER 87
EDINBURG, TEXAS 78540-0087

FILED
AT_____O'CLOCK____M
JUN 10 2014
LAURA HINOJOSA CLERK
District Courts, Hidalgo County
By_____Deputy#44

Dear Clerk:
      If you could would you please be so kind an file this
'Motion To conduct A Court of Inquiry" at the 206TH Criminal
District Court, judge Rose Guerra Reyna Presiding.
      This motion is sent to you for filing under the Texas
Code of Criminal Procedure Article 2.21. (a) (1) (2) (3), please
comply and if so kindly notify me when this legal documentation
is filed. The Motion is filed pursuant to the Texas Code of
Criminal Procedure Article 52.01.
      Thank you for your time and attention to this very important
and urgent matter.

Sincerely,

/s/ _Gustavo L. Mireles_
GUSTAVO L. MIRELES

ENCLOSURES:
CC: Amanda Mireles, 1231 S. 3rd. St. , Alamo, Texas 78516 (956)
      702-1044; Leonor Matano 580 Irene dr canyon-lake, Texas
78102 (512) 787-1180; Florestella Limon, 103 Cottonwood, Donna,
Texas 78537.



FILED
AT_____O'CLOCK__
JUN 10 2014
LAURA HINOJOSA, CLERK
District Courts Hidalgo County
By_____Deputy

Pro-Se                                    §    IN THE 206TH CRIMINAL
COMPLAINTANT
    GUSTAVO L. MIRELES                          DISTRICT COURT, JUDGE

V                                         §    ROSE GUERRA REYNA PRESIDING

HIDALGO COUNTY DISTRICT
ATTORNEY"S OFFICE                         §    HIDALGO COUNTY, TEXAS
RENE GUERRA AND
McALLEN, TEXAS DEPARTMENT OF              §
PUBLIC SAFETY DNA CRIME FIELD
LABORATORY AND SEROLOGIST
ORLANDO OCHOA,                            §
P.O. BOX 819
McAllen, Texas 78505-0819                §

---

### MOTION SEEKING JUDGE TO CONDUCT A COURT OF INQUIRY PURSUANT TO THE TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 52 01.

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Gustavo Mireles, the Complaintant in the above numbered and styled cause, and respectfully asks this Honorable Court to Conduct this Court of Inquiry for the following reasons:

### I. JURISDICTION

This Honorable judge has jurisdiction to conduct such an inquiry, pursuant to the Texas Code of Criminal Procedure Article 52.01. (a) because, when a judge of any district court of this State acting in his capacity as a magistrate, has probable cause to belive that an offense has been committed against the laws of this state, he may request that the presiding judge of the administrative judicial district appoint a district judge to commence a Court of Inquiry,

### II. PROBABLE CAUSE TO INITIATE A COURT OF INQUIRY WHEN AN OFFENSE HAS BEEN COMMITTED AGAINST THE LAWS OF THIS STATE,

### Relevant Facts

In December 12, 2001, Serologist Orlando ochoa who was a forensic analyst for the Texas department of Public Safety DNA Crime Field laboratory conducted a DNA analysis concerning

1

the Capitol Murder of victim Mary Jane Rebollar, He compared DNA biological matter that was alleged to be left behind at the crime scene, to ComplaintantGustavo L Mireles's DNA biological matter genetic fingerprint. The DNA testing policies and procedures utilized by analyst Orlando Ochoa were Short Tandem Repeat (STR), and Polymearse Chain Reaction, (PCR) DNA loci search and compare analyzation. When conducting the analysis, analyst Ochoa searched and compared only 9 DNA loci, (locations). He matched 2 to 3 loci to the Complaintant's DNA sample. He then concluded that because of this 2 to 3 loci match, he had obtained a positive consistant match. However, serologist Ochoa's protocol and methodology that he used to conduct the DNA analysis and comparission, was not an acceptable forensic science standard. The required and acceptable forensic standard was to search for 13 loci, (locations) of DNA from both the crime scene DNA and the suspect's (Gustavo Mireles) Complaintant's DNA sample. This DNA analytical methodology had been established by the Federal Buerua of Investigations Department nation wide begining in October of 1998; 3 years prior to the DNA analysis being conducted in this case by serologist Orlando Ochoa. (See attached Exhibit -A). Serologist Ochoa knew about the 13 loci match requirment, because he testified at trial that some times during DNA testing analysts searched for more then 9 loci, that they searched for 13 to make it more specific to an individual. (See exhibit-B RR. Vol. 9. pg 32 lines 14 to 17). In the instant case he only searched for 9 loci RR. Vol. 9 pg 24 lines 1 to 20, and was only able to match 2 to 3 loci (see exhibit-B). This 13 loci match is the protocol that was established by the FBI for all accreditied DNA laboratories to follow. (See exhibit-A pg. 5 tiltled "Back to High

2

School Biology" and pg. 98 titled "Other genetic locations").
Therefor, since 1998 the FBI established that if the DNA analyst
did not manage to match all 13 loci, from the crime scene to the
suspect's DNA sample 13 loci, the analyst had to concluded that
the crime scene left behind DNA being compared came from some
other person instead of the suspect. (See, other genetic locations
on pg. 124). Orlando Ochoa testified under oath to a jury and that
he had made a positive match from 5 items of DNA biological
matter, that were alleged to be left behind at the crime scene.
(See exhibit -B RR. Vol. 9 pg 19 lines 4 to 17 and pg. 23 lines
1 to 23). By testifing that Gustavo Mireles was the "source" of the
crime scene DNA and that the DNA was "consistant" the analyst and
the DNA laboratory are stating that this DNA profiles originated
from this particular individual, (Gustavo Mireles). He testified
under oath to the jury saying that this facts were true and
corrct, even when he knew or should have known as an expert
wtiness, that in order to concluded that he had made a positive
consistant, source atribution match, he had to search for and
match 13 loci instead of only searching for 9, and only matching
2 to 3 loci. Orlando Ochoa delibertly committed "Aggravated
Perjury" in doing so, which is an offense against the state of
Texas, pursuant to the Texas Penal Code § 37.03 which states
that: (a) person commits an offense if he commits perjury as
defined in Section 37.02 , and the false statement is made:
(1) is made during or in connection with an official proceeding;
(2) is material. Orlando Ocha, made a false statement under oath
and sweared that it was the truth. It is reasonably convincing
that because Ochoa, knew about the 13 loci search and match,

3

prior to testifing as state expert witness, but decided to tell the jury that even though he had matched only 2 to 3 loci he had made a positive match,from the crime scene DNA to that of Gustavo Mireles's DNA sample, he escalated the perjury offense to aggravated perjury; because he knew that the false DNA analysis information contained in his expert testiminy was made during and in connection to an official proceeding. Ochoa's DNA testimony was the sole and primary evidence that linked that Complaintant to the crime scene. It was also the only evidence utilized to obtain this instant conviction. (See exhibit-C).

Furthermore, Ochoa committed the offense "False Report to Peace Office or Law Enforcement Enployee", pursuant to the Texas Penal Code §37.08. when he submitted the DNA test results as trustworthy to Investigator Joel Castro, so that he could then submitt them as evidence to the District Attorney Rene Guerra, to use as addmisable evidence at trial.

Orlando ochoa,further committed the offense of Tampering With or Fabricating Physical Evidence pursuant to the Texas Penal Code § 37.09.  (a) (1) (2), by altering his analysis to read that he had made a conclusive match, and presnting and useing the test results as true, knowing of the DNA tests results falsity and with the intent to affect the course and outcome of the investigation and official proceedings, which resulted in a conviction and sentencing of Gustavo Mireles to life in prison.

Orlando Ochoa, further commited the offense of Tampering With a Goverment Record pursuant to the Texas Penal code § 37.10. (a) (1) (2) (3) (4) (5) (6) , when he knowing made the false entry  and alteration of a goverment record; he presented the record State's #105 and #106 with knowledge of it's falsity and with intent that it be taken as a genuine govermental record;

4

impaired the verity of the goverment record; got paid by the state for the use of the record; presented the record with knowledge of it's falsity. The McAllen, Texas DPS Crime Field Lab, to include it's director Thomas A. Davis Jr., Frankie Waller and David MCeathron assistant Directors, knew or should have known before authorizing the release of this fraudulant test results; that they were false and conducted under false pretense. By allowing the test results to be released and submmitted as evidence to the Hidalgo county prosecutor, Rene Guerra, the McAllen Laboratory and it's directors commited the ofense of the Texas Penal code § 43.06. Acomplice Witness; Testimony and Immunity (a) (b) (c) (d) .

District Attorney Rene Guerra and the trial judge Mario Ramirez Jr. of the 332ND criminal judicial court committed the offense pursuant to the Texas Penal Code § 39.02. Abuse of Official Capacity (a) (1) (2) and Texas Penal Code §39.03. (a) (1) (2). Both Rene Guerra and Judge Mario Ramirez jr. should know the laws of the state of Texas and the laws established by the Federal Goverment. This is very important when both are the "Gate Keepers' of the evidence being submitted to them as being trustworthy, reliable, by the investigating peace officers. Both should have known that the legislature had passed in Sept 1, 1995, the DNA Act, which included the Regulation of DNA Testing; issued by the Executive Branch Department of Public Safety Title Chapter 4 Section 411, and Sec. 411.0205, 411.0206, 411.144 and The Administrative Code Refrence DNA Database Testing See, TAC § 28.1 et seq. which states that:

(b) A DNA Laboratory or criminal justice of law enforcement agency shall follow the procedures:
(1) established under the director of this section;
(2) specified by the Federal Beurea of Investigations, to include the use of compatable testing procedures, laboratory equipment, supplies and comparable computer software.

Before allowing the DNA Test results to be admitted as addmissable evidence under the Texas Rules of Evidence, they're ethical obligation was to ensure that the evidence; in this case the DNA test results were not fraudulant, and met the standard opperating procedures, specified by the FBI, or comparable and compatable to them. The DNA test results in this case are not even close to a compatable or comparable status requirment; when analyzing DNA test results. Both Rene Guerra and Mario Ramirez Jr. recomended to the Court of Criminal Appeals to deny a privious collateral attack on this same issue saying that the FBI's standards and guidelines were meritless and not absolute. The CCA agrred. All have abused they're discreation and official capacity as administers of justice, by allowing the Complaintant Gustavo Mireles to remain incarcerate to life in prison, knowing that the DNA test results utilized to obtain this conviction are unreliable, fraudulant, inaccurate, misleading, and unacceptable forensic science then when the results were conducted in 2001, and now. (See attached exhibit- D)

PRAYER

Do to the reasons contained herein, the Complaintant prays that this Honorable court enter a ruling granting this motion to conduct a Court of Inquiry, in the "intrest of Justice". Signed this 16th day of June 2014.

Respectfully Submmitted,

/s/ Gustavo L. Mireles

Gustavo L. Mireles
3001 S. Emily DR.
McConnell unit
Beeville, Texas 78102

## INMATES DECLARATION

I Gustavo Lopez Mireles, presently incarcerated at the Texas
Department of Criminal Justice Division located at 3001 S. Emily
Drive, McConnell unit, Beeville, Texas, due solemly swear under
penalty of purjury that the foregoing facts are true and correct
to the best of my knowledge.

Signed this 16 day of June 2014.

_____
INMATES SIGNATURE

Case No. <u>CR-3196-01-F</u>

| STATE OF TEXAS | § | IN THE 139TH DISTRICT COURT |
| | § | |
| | § | |
| | § | |
| VS. | § | OF |
| | § | |
| | § | |
| | § | |
| GUSTAVO LOPEZ MIRELES | § | HIDALGO COUNTY, TEXAS |

# ORDER

On this the <u>14</u><sup>th</sup> day of <u>August</u>, 20<u>14</u>, the Court having examined the pleadings, record, and the submitted transcripts, FINDS that there is lack of substantial facts to establish probable cause for conducting a Court of Inquiry.

IT IS THEREFORE ORDERED that a Court of Inquiry not be conducted

SIGNED AND ENTERED on this the <u>14</u><sup>th</sup> day of <u>August</u>, 2014

_____
LOCAL ADMINISTRATIVE JUDGE

GUSTAVO L. MIRELES #1128895
3001 S. EMILY DR.
McCONNELL UNIT
BEEVILLE, TEXAS 78102

May 27, 2014

FILED
AT ___9:5?__ O'CLOCK a M
MAY 3 0 2014
LAURA HINOJOSA, CLERK
District Courts, Hidalgo County
By_____ Deputy#44

HIDALGO COUNTY DISTRICT
CLERKS OFFICE
ATTN: LAURA HINOJOSA
1ST FLOOR COURTHOUSE
100 N. CLOSNER BLVD.
P.O. BOX DRAWER 87
EDINBURG, TEXAS 78540-0087

Dear Honorable Clerk:
      Please, if you could, would you be so kind and file
this foregoing motion for disclosure in the 206th State District
Court, Hidalgo county courthouse, judge Rose Guerra Reyna
presiding.
      Please, notify me when this motion has been recived and was
filed, as I have no other means, to verify that this motion
filed, pursuant to the Texas Code of Criminal Procedure Article
2.21. [Duty of clerks] Section (a), (1) (2) (3) (6). very important
      Thank you for your time and attention to this
and urgent matter.

Sincerly,

/s/ _Gustavo L. Mireles_
GUSTAVO L. MIRELES

ENCLOSURES:
CC: INNOCENCE PROJECTS OF TEXAS, LEONOR MATANO, 580 IRENE DR.
    CANYON-LAKE, TEXAS 78133, Cell: (512) 787-1180; (sister).

B-5

Cause No:

Ex-parte                                §    IN THE 206TH STATE
Gustavo L. Mireles                       §
                                         §    DISTRICT COURT IN THE
v.                                       §
                                         §    HIDALGO COUNTY COURTHOUSE
Rene Guerra                              §
Hidalgo County, Texas                    §    EDINBURG, TEXAS MAY 30 2014
District Attorney                        §
Edinburg, Texas                          §
                                         §

FILED
AT ___ O'CLOCK ___ M
MAY 30 2014
LAURA HINOJOSA CLERK
District Courts, Hidalgo County
By ___ Deputy#44

## MOTION FOR DISCLOSURE CONCERNING EXCULPATORY MATERIAL PURSUANT TO THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Gustavo L. Mireles, in the above mentioned and styled cause, and will respectfully show this Honorable Court the following:

### I. JURISDICTION

This honorable court has the jurisdiction to grant this motion even without a request for Brady evidence, material evidence which is favorable to the accused. (See, Kyles v. Whitly, 514 U. S. 419, 433 (1995), United States v. Bagley, 473 U.S. 667, 680 (1985); United States v. Agurs, 427, U.S. 97, 107 (1976); Brady v. Maryland, 373 U.S. 83 (1963) Ex parte Mowbray, 943 S.W. 2d 461, 466 (tex cr. App. 1996) the State has an "afirmative duty", to disclose favorable evidence.

The State has a continuing duty to disclose favorable evidence. At trial this duty is enforced by the requirements of due process, but after a conviction the prosecutor also is bound by the ethics of his office to inform the defendant or appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction. (see, Imbler v. Pachtman, 424 U.S. 409, 427 (1976) (FN25).

1

Cause No:

| | |
|---|---|
| Ex-parte<br>Gustavo L. Mireles | § IN THE 206TH STATE<br>§<br>§ DISTRICT COURT IN THE |
| v. | §<br>§ HIDALGO COUNTY COURTHOUSE IN |
| Rene Guerra<br>Hidalgo County, Texas<br>District Attorney<br>Edinburg, Texas | §<br>§ EDINBURG, TEXAS<br>§<br>§<br>§ |

MOTION FOR DISCLOSURE CONCERNING EXCULPATORY MATERIAL PURSUANT TO THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Gustavo L. Mireles, in the above mentioned and styled cause, and will respectfully show this Honorable Court the following:

## I. JURISDICTION

This honorable court has the jurisdiction to grant this motion even without a request for Brady evidence, material evidence which is favorable to the accused. (See, Kyles v. Whitly, 514 U. S. 419, 433 (1995), United States v. Bagley, 473 U.S. 667, 680 (1985); United States v. Agurs, 427, U.S. 97, 107 (1976); Brady v. Maryland, 373 U.S. 83 (1963) Ex parte Mowbray, 943 S.W. 2d 461, 466 (tex cr. App. 1996) the State has an "afirmative duty", to disclose favorable evidence.

The State has a continuing duty to disclose favorable e evidence. At trial this duty is enforced by the requirements of due process, but after a conviction the prosecutor also is bondd by the ethics of his office to inform the defendant or appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction. (see, Imbler v. Pachtman, 424 U.S. 409, 427 91976) (FN23).

1

## II. DISCLOSURE EXCULPATORM MATERIAL BEING SOUGHT

## RELEVANT FACTS

On June 27, 2001, at 8:35 o'clock PM Magistrate judge Rose Guerra Reyna , issued a search warrant in case #01-13077, for the eXstraction of blood samples, saliva, body hair, and publc hair, belonging to Gustavo Mireles. It was the belief of th the Affiant Hidalgo County Sherriff's Department Investigatorr Noe Canales, that these DNA samples taken from Gustavo Mireles and submitted to the McAllen texas CPImCrime Field DNA laboratory for comparison, would show a match with the samples recovered from the victim. this would then constitute evidence tending to show that Gustavo Mireles had committed the Capitol Murder of Victim mary jane Rebollar. (See attached exhibit A).

The order was executed on June 28, 2001, without the consent of Gustavo Mireles , who was did not trust the Hidalgo county investigation department, due to curruption atributes, which had been well established through out the history of the Hidalgo County, Sherriff's department; as it continues to be established in regards to the Panama Unit, and former Sherriff Lupe Trevino's plea of guilty to curruption charges.

## ARGUMENT AND AUTHORITIES

Defendant Gustavo mireles was tried and convicted to life in prison, based soley and primarily on the DNA evidence testimony and test results conducted by the McAllen texas DNA Laboratory. However, just several months after Gustavo Mirles's conviction, the DNA laboratory of McAllen texas was secretly closed witnout notifying the Hidalgo county District Attorney's office. (See attached exhibit B).

2

The secret closure was first made public in March 15, 2004. Ghetavo Mireles had already been convicted and sentenced to life in prison, in August 8, 2002. the laboratory was secretly closed through June and septemberrof 2003. District Attorney Rene Guerra himself told the News media that.If the DNA evidence played a major role in a defendant's conviction on cases that had already been tried and adjucated, that those cases had to be itemized and re-evaluated. This was to make sure that all the DNA testing policies and procedures had been properly followed when conducting the DNA analysis on cases.

DPS spokeperson Tom Vinger, told the news media that 40 cases had already been reviewed that had shown no faulty testing. He further stated that the DPS still had 187 more cases that needed to be scrutinized. (refer to attached exhibit B0. Spokewoman for the DPS, acknowledged to the news media that it was approximately 300 cases that needed to be scrutinized instead of just 187. (Tela Mange).

Alex Madrigal the director of the McAllen, Texas DNA DPS crime field Laboaatory, told the media and confirmed that the laboratory had been using outdated older DNA insturments and protocols; which were out of compliance with "standard operating procedures". The director's excuse was that the laboratory was given permission to use these outdated old protocols and insturments, because the laboratory was "Grandfathered". Analysts that were not involved in the DPS audit, confirmed to the news media that the failure of the Mcallen tx, DNA analyst to know the sensitivity of the insturment used to determine DNA profiles, indicated that the analysts were only guessing about the DNA test results.

3

## ARGUMENT

Gustavo Mirels, asks this Honorable court to issue an administrative order, to establish if GUstavo Mireles DNA case Agency #0113077, Laboratory Case #L3M-48628, offense Date 6/23/01 was re-evaluated. Also what were the DNA testing policies and procedures and guidelines that were used in the evaluation process and the analytical methodology utilized therein. Did the McAllen, Texas DNA Laboratory conduct the analysis in compliance with and pursuant to the Executive Branch Department of Public Safety title 4 Chapter § 411, 411.144 Regulation of DNA Laboratories; Penalties added by the Acts of 1995 74th Legislature 595, 1: effective September 1, 1995; the Crime Laboratory Accreditation Process, See, V.T.C.A. Govt. code § 411.0205, and Regulation of DNA Testing Govt Code § 411.0206 Administratvie Cod Code refrence, DNA Database, See, TAC § 28.1 et seq. which states that : All Department of Public Safety DNA laboratories in the United States must and shall:

(a) the director by rule shall establish procedures for DNA laboratory or criminal justice law enforcement agency in the collection, preservation, shipment, analysis, and use of blood sample or other spicimen for forensic DNA analysis in a manner that permits the exchange of the DNA evidence between DNA laboratories and the use of the evidence in a criminal case.

(b) A DNA laboratory or criminal justice of law enforcement agency shall follow the procedures:

(1) established under the director of this section; and

(2) specified by the Federal Bureau of Investigations, to include, the use of comparable testing procedures, laboratory equipmant, supplies and compatable computor software.

4

Compatable DNA testing procedures to those of the Federal **Bureau of Investigation**

Bureau of Investigationsspolicies and procedures would have required the McAllen, Texas laboratory to utilize the standards used by the FBI to compare and match DNA samples from the crime scene to GustasocMisedes's DNA sample and genetic profile. This analytical DNA Testing methodology was established nationwid wide in 1998, which required identicle findings at a minimum of 13 docfrent loci on the DNA from both the crime,scene and the suspect's DNA samples. The 13 CODIS (Combined DNA Index System) core loci were and are: CSF1PO, FGA, TH01, TPOX, VWA, D3S1158, D5S818, D7S820, D8S1179, D13S317, D16S539, D18S51, and D21S11. This was to ensure that the analyst had conducted his analysis in compliance and had searched for all 13 loci and matched them, in order for the BNA test results to be considered a "match". If the analyst was off just 1 of these 13 loci, and even if he or she managed to match 12 other loci, he would have to agree that the source of the DNA sample belonged to some other individual, and not the suspect. (See attached exhibit C).

Honorable Judge presiding Rose Guerra Reyna, has just recently in Febuary 2002014, sentenced defendant Arturo Almaguer to 2 consecutive life sentences for the murderrof Evan and Wilda Squires in 1988 "Cold Case". It was this same FBI DNA testing policies and procedures that Rene guerra and his District Attorney's Office utilized to link Almaguer to the crime scene, and convict him of the murders. This DNA testing analytical methodology that was established by the FBI nationwide back in October 13, 1998. (See attached exhibitCC).

5

Hidalgo county District Attorney, or no one from his Office, has ever notified Gustavo Mireles concerning the re-evaluation of his DNA case files; concerning the DNA re-testing and the podicie policies and procedures used in the re-evaluation process.

Gustavo Mireles, has a Constitutional Right, to be notified about the issue of the re-evaluation of his DNA case file, which was used to incriminate him. If this evidence is disclosed, there is a reasonable probability that it may be favorable in future appellate proceedings; if and when the supressed evidence undermines the confidence in the out come of the trial. It is and was Rene Guerra's duty to learn as an individual prosecutor, of any favorable evidence known to others acting on the goverment behalf in this case, including the police. (See, Kyles, 514 U.S. at 437-438, Ex-parte Adams, 768 S.W. 2d at 291-92). If error results in the charecter of the evidence, it's not Rene Guerra the prosecutor, that determines whether the supression of the evidence results in constitutional error. (see, Agurs, 427 U.S. at 110.).

## CONCLUSION

For the reasons stated in this motion, it ie the ethical duty of the presiding magistrate to enter a ruling pursuant to th a "Ministerial Act"; which requires a trial court to consider and rule on a motion within a reasonable time. (See, Barnes v. state, 832 S.W. 2d 424, 426 (Tex App. Houston [1st dist.] 1992 orig. proceeding). When a motion is properly filed and pending before a trial court, considering and ruling on that motion is a ministerial act, and mandamus may issue to compell the trial court to act. (see, kissan v. Williams, 545 S.W. 2d 266-67, (tex Civ.App. Tyler orig. proceeding 1976).

6

Mandamus is an appropiate proceeding in a criminal case if the relator shows that the act sought to be compelled is purely ministerial and relator has no other wamedy at law. (see, Simon v. Levario, 306 S.W. 3d 318-20 (tex cr. App. 2009).

PRAYER

Relator, Gustavo mireles, prays that this Honorable Court enter a ruling concerning the issues presented in this motion, and that the court act in it's ministerial duty, when doing so. Furthermore, Relator asks this court to grant this motion, and compell Rene guerra or his district attorney's Office, to properly investigate in a timely manner, and check and see if Gustavo Mireles's DNA case's analysis, were re-evaluated; and to provide Gustavo mireles with such re-evaluation, to include the analytical methodology utilized in conducting the re-evaluation DNAlforensic analysis.

Signed on this 27 day of May 2014.

Respectfully Submitted,

/s/ _Gustavo L. Mireles_

Gustavo L. Mirles
3001 S. Emily Dr.
TDCJ-ID #1128895
McConnell unit
Beeville, Texas 78102.

INMATE DECLARQATION

I Gustavo Mireles, being presently incarcerated at the Institutional Division, of the Texas Dept. of correctional Justice Mcconnell unit, beeville, texas, swear under penalty of purjury that the foregoing facts and documents are true and correct to the best of my knowledge.

_Gustavo L. Mireles_
Signature

7

CHIEF JUSTICE
  ROGELIO VALDEZ

JUSTICES
  NELDA V. RODRIGUEZ
  DORI CONTRERAS GARZA
  GINA M. BENAVIDES
  GREGORY T. PERKES
  NORA L. LONGORIA

CLERK
  DORIAN E. RAMIREZ



# Court of Appeals
## Thirteenth District of Texas

NUECES COUNTY COURTHOUSE
901 LEOPARD, 10TH FLOOR
CORPUS CHRISTI, TEXAS 78401
361-888-0416 (TEL)
361-888-0794 (FAX)

HIDALGO COUNTY
ADMINISTRATION BLDG.
100 E. CANO, 5TH FLOOR
EDINBURG, TEXAS 78539
956-318-2405 (TEL)
956-318-2403 (FAX)

www.txcourts.gov/13thcoa

December 18, 2014

Mr. Gustavo Lopez Mireles
TDCJ #1128895
3001 S. Emily Drive
McConnell Unit
Beeville, TX 78102

Hon. Rene A. Guerra
Criminal District Attorney
Hidalgo County Courthouse
100 N. Closner, Room 303
Edinburg, TX 78539
* DELIVERED VIA E-MAIL *

Re:      Cause No. 13-14-00600-CR
Tr.Ct.No. CR-3196-01-F
Style:   Gustavo Lopez Mireles v. The State of Texas

Enclosed please find the opinion and judgment issued by the Court on this date.

Very truly yours,

Dorian E. Ramirez, Clerk

DER:jgp
Enc.
cc:   Hon. Rose Guerra Reyna (DELIVERED VIA E-MAIL)
      Hon. Laura Hinojosa (DELIVERED VIA E-MAIL)
      State Prosecuting Attorney (DELIVERED VIA E-MAIL)
      Hon. J. Rolando Olvera Jr. (DELIVERED VIA E-MAIL)

Rec   Dec. 23, 2014



# THE THIRTEENTH COURT OF APPEALS

## 13-14-00600-CR

Gustavo Lopez Mireles
v.
The State of Texas

On Appeal from the
206th District Court of Hidalgo County, Texas
Trial Cause No. CR-3196-01-F

## JUDGMENT

THE THIRTEENTH COURT OF APPEALS, having considered this cause on appeal, concludes the appeal should be dismissed. The Court orders the appeal DISMISSED in accordance with its opinion.

We further order this decision certified below for observance.

December 18, 2014



NUMBER 13-14-00600-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

GUSTAVO LOPEZ MIRELES,                                          Appellant,

v.

THE STATE OF TEXAS,                                            Appellee.

On appeal from the 206th District Court
of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Longoria**
**Memorandum Opinion Per Curiam**

Appellant, Gustavo Lopez Mireles, pro se, filed a notice of appeal on October 14, 2014, from the trial court's September 29, 2014 denial of appellant's "Motion for Disclosure Concerning Exculpatory Material Pursuant to the Due Process Clause of the Fourteenth Amendment of the United States Constitution." This Court previously

The Court, having examined and fully considered the notice of appeal and the documents on file, is of the opinion that there is not an appealable order and this Court lacks jurisdiction over the matters herein. Accordingly, this appeal is DISMISSED for lack of jurisdiction. All pending motions are likewise DISMISSED.

PER CURIAM

Do not publish.
See TEX. R. APP. P. 47.2(b).

Delivered and filed the
18th day of December, 2014.

ATTACHED

EXHIBIT

B



Consist of:

(1) Cause NO: CR-3196-01-F State of Texas v. Gustavo L. Mireles Reporter's Records Volume 9. Trial on the merits, on the 6th day of August 2002. State Forensic analysis Orlando's Ochoa's. trial testimony.

(2) EXECUTIVE BRANCH DEPARTMENT OF PUBLIC SAFETY TITLE 4 Ch. 411 SUBCHAPTER G. DNA DATABASE SYSTEM, refrence to § 411.142. DNA Database (b) (f) (g) (h).

(3) State's Exhibit #105 Texas Department of Public Safety Physical Evidence Submission Form and State's Exhibit #106 Serologist Orlando Ochoa's DNA Test Results conducted December 12, 2001.

(4) McAllen Texas DPS. Crime Field Laboratory Shut-Down. News Paper articles of audit conducted.

(5) Motion for Disclosure concerning the Mcallen Texas DPS. DNA Crime Field Laboratory's closure; and Motion to Conduct a "court of Inquiry".

(6) Newly Discovered forensic affidavit evidence from forensic analyst Harry J. Bonnell and Jonh Plunkett.

(7) United States Department of Justice , Office of Justice Programs, National Institute of Justice letter and publication of "DNA For the Defense Bar" substantiating 13 loci search and match.

15-02-106-CR

FILED
IN THE 13TH COURT OF APPEALS
CORPUS CHRISTI

JUN - 5 2003

CATHY WILBORN, CLERK
BY _____

## REPORTER'S RECORD
### VOLUME 9 OF 15
TRIAL COURT CAUSE NO. CR-3196-0

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | HIDALGO COUNTY, TEXAS |
| | § | |
| GUSTAVO MIRELES | § | 332ND JUDICIAL DISTRICT |

# REPORTER'S RECORD

## Trial on the Merits

On the 6th day of August, 2002 the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable MARIO RAMIREZ, Judge presiding, held in Edinburg, Hidalgo County, Texas:

Proceedings reported by oral stenography.

RACHEL M. KRAM, CSR
OFFICIAL COURT REPORTER
92ND JUDICIAL DISTRICT COURT
100 N. CLOSNER
EDINBURG, TX 78539
(956) 318-2250

B-1

ORIGINAL

DELIVERED JUN - 5 2003

A. Those are used as a reference or known standards that we use to compare to unknown evidence that we receive.

Q. Concerning the two blood lifts from the outside of the Chevy pickup truck, the blood stain from the victim's jeans, and the black hair that you recovered in the purse, could you determine who was the most likely contributor of that DNA?

A. Yes.

Q. Who is that?

A. It is consistent with the suspect.

Q. And when you say consistent, how do you determine if it's consistent?

A. Again, we're looking at the different regions of the DNA and comparing them to the different -- to the regions of the DNA to the known standard from the suspect.

Q. And the hair that you tested there was the pubic hair?

A. That is correct.

Q. What is the chance that the contributor of the DNA is the defendant?

MR. VILLARREAL: Objection, Your Honor, asking the witness to speculate.

THE STATE: Your Honor, he provides the

same information in his report and it's part of the same scientific testing he conducted.

MR. VILLARREAL: Your Honor, the specificity of his report is based on six million people -- I'm sorry, I believe six billion people worldwide. We're talking about 147 billion people, which exceeds the six billion that are in the world alone, so where is the basis there? And more importantly, Your Honor, that did not allow for the specific races, Caucasian, Negroid, Afro-American, and Mexican-American or Hispanics.

THE COURT: The objection is overruled.

Q. (By Mr. Schammel) When you make your comparison, do you factor -- do you base the comparison based upon different races and the probability that that DNA will appear in different races?

A. Well, we do. Once we get a DNA profile --

MR. VILLARREAL: Objection, Your Honor, becoming nonresponsive; calls for a yes or no answer.

THE COURT: Sustained.

Q. (By Mr. Schammel) What do you do once you get the results?

A. We provide a probability of a match.

Q. And what is the -- what do you use as a basis

for the probability of the match?

A. It's a data base, it's a computer system that we use where we enter the DNA profile that we obtained from the evidence and it provides us with a statistical value.

Q. Does that statistical value -- is it correlated for different races or is it for the world in general?

A. It -- it's divided into different -- three different races.

Q. Which races is it divided into?

A. Caucasian, Blacks, and Hispanics.

Q. What is the chance of seeing the DNA profile -- what is the probability of a person being the source of the DNA profile that you obtained?

A. The -- for which items?

Q. For the blood stains from the Chevy pickup, the blood stain on the victim's jeans, and the pubic hair found in the purse.

A. For -- the DNA profile that was obtained from the blood stain of the Chevy pickup, the blood stain from the victim's jean, and one of the pubic hairs from the black purse, the probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately one in

THE COURT: That's sustained.

A. Can -- let me --

THE COURT: Wait a minute. Go ahead, Mr. Schammel.

Q. (By Mr. Schammel) Given the population of the world, how likely is it that this is the -- that the defendant is the person?

A. Again, one in 1 trillion-168 billion for Caucasians, one in 301 trillion-700 billion for Blacks, and one in 147 billion-300 million for Hispanics.

Q. Now, was there any other DNA that was obtained from any other items?

A. Yes, there was.

Q. Was there any other DNA obtained from items that matched the defendant?

A. Yes.

Q. What items were they?

A. A second hair from the black purse.

Q. And what was the likelihood of the defendant being the person who contributed that DNA sample?

A. One in 34,230 for Caucasians, one in 181,900 for Blacks, and one in 24,180 for Hispanics.

Q. Now, why is there a variance from that particular hair, the DNA you obtained there, compared

to the DNA you obtained on the other hair?

A. Yes, because we're looking for, as I mentioned earlier, we're looking for various regions of the DNA. We're testing various regions, nine regions of the DNA plus the sex chromosome that allows us to determine if the -- the body fluid comes from a male or a female. Depending on how many of those regions we're able to recover doing our DNA analysis and do a comparison, the numbers may vary. In other words, if we get a full profile, if we're able to get all nine regions to come up and give us a profile for the specimen or for the body fluid, then we're able to compare those nine regions and get a better number whereas if we were to compare -- because we only got two -- two or three of the regions, we're not able to compare as many regions of the DNA so we're not able to get the more specific -- or the more specific statistical values.

Q. What are some of the reasons that you would obtain less than all nine of these points that you're looking for?

A. Again, the conditions of the body fluid, of the evidence itself. Well, was there degradation of the DNA, were there dyes or chemical that might have interfered with the technology, the DNA processing.

Q. Was there any other DNA obtained in this case?

A.   Yes, there was.

Q.   And was there any of that DNA that matched the victim in this case?

A.   Yes, there was.

Q.   What specifically did you find that matched the victim?

A.   A hair obtained from the victim's socks and blood from the victim's fingernail scrapings.

Q.   And these were consistent with Mary Jane?

A.   Correct.

Q.   And what is the likelihood that she was the person that left that DNA there?

A.   One in 28 for Caucasians, one in nine for Blacks, one in 14 for Hispanics.

Q.   Now, this is extremely low.  What would have caused that?

A.   The blood itself that was recovered from the victim was not letting itself to DNA analysis, so I wasn't able to get a complete profile from the known blood.  It appeared to be diluted.  It could have been caused by -- during the autopsy or something that it might have been diluted out to where I wasn't able to get good DNA.

Q.   As to the blood under the victim's fingernails and on the hair from the sock, you can say that the

defendant is not the contributor there?

A.   Yes.

Q.   Now, were there any items on which no DNA was recovered?

A.   Yes, there was.

Q.   Several?

A.   Yes.

Q.   The screwdrivers and knives that were admitted, was there any blood or other DNA evidence recovered from those?

A.   There was no blood detected.

Q.   As to the drill bit also?

A.   Which item are you referring to?

Q.   Item number 42-B on your list.   It would be State's 73-B.

A.   No blood was detected.

THE STATE:   Permission to approach the witness?

THE COURT:   Yes.

Q.   (By Mr. Schammel)   Let me show you what was previously marked as State's 85, and it was previously testified that there is nothing inside of State's 85. Do you see anything there?

A.   No.

Q.   What was the laboratory number on State's 85?

Q.   So if you look at other places, you might have been able to find someone else?

A.   You're going to -- the probability, again, would be that you would find that profile in another individual.

Q.   So if we got 31 people in there, there's a probability or a possibility that one of us did it?

A.   Or that one of you has that DNA profile.  Just like you mentioned with the DQ alpha that it's one region and that's why you get the statistical values of one in 14, I believe you said, one in 20- --

Q.   One in 28 total and in Hispanics is one in five.

A.   Right.  And so that's why we -- we look at more than one region, more than two regions.  We look at nine, ten regions up to 13 regions to make it more specific to an individual.

It's -- for example, if you don't mind me explaining a little bit more.  It's like, for example, you're looking for an individual.  Well, you're looking for a female, so that's going to cut out all the males.  You're looking for a female that is looking five foot -- five feet, so that's going to cut out everybody that's not five feet.  So the more things that you look at, the more specific it becomes

is. That's not --

Q. So if the stain was two weeks old, you couldn't tell the difference between a two-day old and a two-week old stain, would you?

A. That's correct.

Q. And if the stain were let's say contaminated as you say the victim's blood was, which you could not type -- is that correct, you could not type her blood -- or you found no DNA?

A. It didn't give us -- it didn't give us all of the regions that we looked at or that we amplified.

Q. Which means you got negative results on her DNA?

A. On some of the -- we got like maybe two locus out of 10 loci that we looked at.

Q. Let's talk plain English.

A. Okay.

Q. You didn't match her own blood.

A. We didn't match her own blood?

Q. Yeah.

A. That's not -- not necessarily true.

Q. But is it possible?

A. That you're not matching --

Q. Could you put it that way?

A. That you're not matching someone's blood?

Q.   Yes.

A.   Well, if you're obtaining the blood from t[ ] individual, you know that that individual -- it belongs -- or that blood belongs to that individua[ ]

Q.   That's common sense, isn't it?

A.   Yes.

Q.   But if DNA says according to -- and is use[ ] a known standard, your item number 22-A, blood fro[ ] victim, however the blood was not suitable for DN[A] analysis.  Common sense says it's her blood.

A.   Right.

Q.   But DNA says it's not.

A.   Not -- it's not saying that it's not her blood.  It's saying that it wasn't able to provide[ ] with --

Q.   See, we've been playing word games with th[ ] other officers.

A.   Okay.

Q.   My question is this --

THE STATE:  Objection to the side bar[ ] Your Honor.

Q.   -- DNA --

THE COURT:  Hold on.

MR. VILLARREAL:  I apologize, Your Ho[ ] and to the jury.

(c) A state agency that obtains criminal history record information under this section may not release or disclose the information or any documents or other records derived from the information except:

(1) by court order;

(2) with the consent of the person who is the subject of the information; or

(3) to the affected contractor or subcontractor, unless the information was obtained by the department from the Federal Bureau of Investigation.

(d) A state agency and the affected contractor or subcontractor shall destroy criminal history record information obtained under this section that relates to a person after the information is used to make an employment decision or to take a personnel action relating to the person who is the subject of the information.

(e) A state agency may not obtain criminal history record information under this section unless the state agency first adopts policies and procedures that provide that evidence of a criminal conviction or other relevant information obtained from the criminal history record information does not automatically disqualify an individual from employment. The attorney general shall review the policies and procedures for compliance with due process and other legal requirements before adoption by the state agency. The attorney general may charge the state agency a fee to cover the cost of the review. The policies and procedures adopted under this subsection must provide that the hiring official will determine, on a case-by-case basis, whether the individual is qualified for employment based on factors that include:

(1) the specific duties of the position;

(2) the number of offenses committed by the individual;

(3) the nature and seriousness of each offense;

(4) the length of time between the offense and the employment decision;

(5) the efforts by the individual at rehabilitation; and

(6) the accuracy of the information on the individual's employment application.

(f) A criminal history record information provision in another law that is more specific to a state agency, including Section 411.089, prevails over this section to the extent of any conflict.

Added by Acts 2003, 78th Leg., ch. 87, § 1, eff. Sept. 1, 2003.

### Library References

Criminal Law ⊕1226(2).<br>
Westlaw Topic No. 110.<br>
C.J.S. Criminal Law § 1734.

### Research References

**Encyclopedias**

TX Jur. 3d Public Officers & Employees § 165, Generally; Merit System.

---

## SUBCHAPTER G. DNA DATABASE SYSTEM

### Cross References

Community supervision, conditions, submission of sample for purpose of creating a DNA record, see Vernon's Ann.C.C.P. art. 42.12.

## § 411.141. Definitions

In this subchapter:

(1) "DNA" means deoxyribonucleic acid.

(2) "DNA database" means the database that contains forensic DNA records maintained by the director.

(3) "DNA laboratory" means a laboratory that performs forensic DNA analysis on samples or specimens derived from a human body or crime scene.

(4) "DNA record" means the results of a forensic DNA analysis performed by a DNA laboratory and, if known, the name of the person who is the subject of the analysis.

(5) "FBI" means the Federal Bureau of Investigation.

(6) "Institution of higher education" has the meaning assigned by Section 61.003, Education Code.

(7) "Institutional division" means the institutional division of the Texas Department of Criminal Justice.

(8) "Penal institution" has the meaning assigned by Section 1.07, Penal Code.

Added by Acts 1995, 74th Leg., ch. 595, § 1, eff. Sept. 1, 1995.

### Historical and Statutory Notes

Section 3(a) of Acts 1995, 74th Leg., ch. 595 provides:

"The director of the Department of Public Safety shall adopt the rules required by Sub-chapter G, Chapter 411, Government Code, as added by this Act, not later than January 1, 1996."

### Research References

**Encyclopedias**

TX Jur. 3d Criminal Law § 4372, Registration as Sex Offender; Ochiectomy.<br>
TX Jur. 3d Criminal Law Five XX B Ref., Divisional References.

**Forms**

Texas Jurisprudence Pleading & Practice Forms 2d Ed § 94:36.10, Order-Of Disposi-tion-Placing Child on Probation for Conduct Constituting Sexual Offense.

**Treatises and Practice Aids**

Dix and Dawson, 43A Tex. Prac. Series § 39.110, Submit a Dna Sample to Dps.

## § 411.142. DNA Database

(a) The director shall record DNA data and establish and maintain a computerized database that serves as the central depository in the state for DNA records.

(b) The director may maintain the DNA database in the department's crime laboratory in Austin or another suitable location.

(c) The director may receive, analyze, store, and destroy a record, blood sample, or other specimen for the purposes described by Section 411.143.

(d) The DNA database must be capable of classifying, matching, and storing the results of analyses of DNA and other biological molecules.

(e) The director, with advice from the Department of Information Resources, shall develop biennial plans to:

(1) improve the reporting and accuracy of the DNA database; and

(2) develop and maintain a monitoring system capable of identifying inaccurate or incomplete information.

(f) The DNA database must be compatible with the national DNA identification index system (CODIS) used by the FBI to the extent required by the FBI to permit the useful exchange and storage of DNA records or information derived from those records.

(g) The DNA database may contain DNA records for the following:

(1) a person described by Section 411.148 or 411.150;

(2) a biological specimen of a deceased victim of a crime;

(3) a biological specimen that is legally obtained in the investigation of a crime, regardless of origin;

(4) results of testing ordered under Article 64.03, Code of Criminal Procedure;

(5) an unidentified missing person, or unidentified skeletal remains or body parts;

(6) a close biological relative of a person who has been reported missing to a law enforcement agency;

(7) a person at risk of becoming lost, such as a child or a person declared by a court to be mentally incapacitated, if the record is required by court order or a parent, conservator, or guardian of the person consents to the record; or

(8) an unidentified person, if the record does not contain personal identifying information.

(h) The department shall establish standards for DNA analysis by the DNA laboratory that meet or exceed the current standards for quality assurance and proficiency testing for forensic DNA analysis issued by the FBI. The DNA database may contain only DNA records of DNA analyses performed according to the standards adopted by the department.

Added by Acts 1995, 74th Leg., ch. 595, § 1, eff. Sept. 1, 1995. Amended by Acts 2001, 77th Leg., ch. 2, § 4, eff. April 5, 2001.

**Library References**

Criminal Law ☞1226(1).
Westlaw Topic No. 110.
C.J.S. Criminal Law § 1734.

---

## § 411.143. Purposes

(a) The principal purpose of the DNA database is to assist federal, state, or local criminal justice or law enforcement agencies in the investigation or prosecution of sex-related offenses or other offenses in which biological evidence is recovered.

(b) In criminal cases, the purposes of the DNA database are only for use in the investigation of an offense, the exclusion or identification of suspects, and the prosecution of the case.

(c) Other purposes of the database include:

(1) assisting in the recovery or identification of human remains from a disaster or for humanitarian purposes;

(2) assisting in the identification of living or deceased missing persons; and

(3) if personal identifying information is removed:

(A) establishing a population statistics database;

(B) assisting in identification research and protocol development; and

(C) assisting in database or DNA laboratory quality control.

(d) The information contained in the DNA database may not be collected, analyzed, or stored to obtain information about human physical traits or predisposition for disease unless the purpose for obtaining the information is related to a purpose described by this section.

(e) The director may not store a name or other personal identifying information in the CODIS database. A file or reference number to another information system may be included in the CODIS database only if the director determines the information is necessary to:

(1) generate an investigative lead or exclusion;

(2) support the statistical interpretation of a test result; or

(3) allow for the successful implementation of the DNA database.

(f) Except as provided by this subchapter, the DNA database may not include criminal history record information.

Added by Acts 1995, 74th Leg., ch. 595, § 1, eff. Sept. 1, 1995.

**Library References**

Criminal Law ☞1226(1).                     C.J.S. Criminal Law § 1734.
Searches and Seizures ☞78.                 C.J.S. Searches and Seizures §§ 31, 103 to
Westlaw Topic Nos. 110, 349.                   106.

**Research References**

ALR Library
76 ALR 5th 239, Validity, Construction, and
   Operation of State Dna Database Statutes.

### Notes of Decisions

In general  1
Privacy rights  3
Purpose  2

**1. In general**

For purposes of Fourth Amendment analysis of legality of blood draw ordered pursuant to statute, purposes of statute establishing state DNA databank demonstrated need for DNA samples beyond normal need for law enforcement; statute was not designed to discover and produce evidence of specific individual's criminal wrongdoing. In re D.L.C. (App. 2 Dist. 2003) 2003 WL 22976095. Searches And Seizures ⟨key⟩ 78

Statute permitting juvenile courts to require submission of blood or other samples for purposes of DNA records as condition of probation in delinquency adjudication proceedings was not punitive on its face, for purposes of ex post facto analysis; statute's location in dispositional portion of juvenile justice code did not render statute punitive, and legislature's express, primary intent in creating DNA record was to assist with identifications in past and future sex offenses. In re D.L.C. (App. 2 Dist. 2003) 2003 WL 22976095. Constitutional Law ⟨key⟩ 203; Infants ⟨key⟩ 132

**2. Purpose**

For purposes of Fourth Amendment analysis of the legality of a blood draw ordered pursuant to statute, the primary purpose of the state DNA databank is to assist in investigation or prosecution of sex-related offenses or other offenses in which biological evidence is recovered and to exclude or identify suspects; secondary purposes are to assist in recovery or identification of human remains from a disaster or for humanitarian purposes, to assist in identification of living or deceased missing persons, and to

establish a population statistics database, assist in identification research and protocol development, and assist in database or DNA laboratory quality control. In re D.L.C. (App. 2 Dist. 2003) 2003 WL 22976095. Searches And Seizures ⟨key⟩ 78

**3. Privacy rights**

Statute permitting juvenile courts to require submission of blood or other samples for purposes of DNA records as condition of probation in delinquency adjudication proceedings did not promote traditional aims of punishment, despite potential deterrent effect of existence of offender databank, for purposes of determining whether statute was punitive in its effect, as element of ex post facto analysis, where legislatively stated purpose of statute was identification, that is, to exclude or include registrants as suspects in past and future offenses; and "threat" of blood draw was not, in itself, significant enough to deter potential offenders from committing sex offenses. In re D.L.C. (App. 2 Dist. 2003) 2003 WL 22976095. Constitutional Law ⟨key⟩ 203; Infants ⟨key⟩ 132

Statute permitting juvenile courts to require submission of blood or other samples for purposes of DNA records as condition of probation in delinquency adjudication proceedings did not impose affirmative disability with respect to juvenile probationers' constitutional privacy rights, for purposes of determining whether statute was punitive in its effect as element of ex post facto analysis; constitutional rights of juvenile probationers, including constitutional privacy rights, were diminished, and possibility of wrongful disclosure of information was minimized by statutory limitations on disclosure. In re D.L.C. (App. 2 Dist. 2003) 2003 WL 22976095. Constitutional Law ⟨key⟩ 82(10); Constitutional Law ⟨key⟩ 203; Infants ⟨key⟩ 132



## § 411.144. Regulation of DNA Laboratories; Penalties

(a) The director by rule shall establish procedures for a DNA laboratory or criminal justice or law enforcement agency in the collection, preservation, shipment, analysis, and use of a blood sample or other specimen for forensic DNA analysis in a manner that permits the exchange of DNA evidence between DNA laboratories and the use of the evidence in a criminal case.

(b) A DNA laboratory or criminal justice or law enforcement agency shall follow the procedures:

(1) established by the director under this section; and

(2) specified by the FBI, including use of comparable test procedures, laboratory equipment, supplies, and computer software.

(c) The director may at any reasonable time enter and inspect the premises or audit the procedures of any DNA laboratory that provides DNA records or DNA forensic analyses to the department under this subchapter.

(d) A DNA laboratory conducting a DNA analysis under this subchapter shall:

(1) forward the DNA record of the analysis to the director at the department's crime laboratory or another location as required by the department; and

(2) comply with this subchapter and rules adopted under this subchapter.

(e) If a DNA laboratory violates this subchapter or a rule adopted under this subchapter, the director may prohibit the laboratory from exchanging DNA records with another DNA laboratory or criminal justice or law enforcement agency. A DNA laboratory prohibited from exchanging DNA records under this subsection may petition the director for a hearing to show cause why the laboratory's authority to exchange DNA records should be reinstated.

(f) The director is the liaison for DNA data, records, evidence, and other related matters between the FBI and a DNA laboratory or a criminal justice or law enforcement agency.

(g) The director may:

(1) conduct DNA analyses; or

(2) contract with a laboratory, state agency, private entity, or institution of higher education for services to perform DNA analyses for the department.

(h) The institutional division may:

(1) collect a blood sample or other specimen for forensic DNA analysis; or

(2) contract with a laboratory, state agency, private entity, or institution of higher education for services to collect a sample or other specimen under this subchapter.

Added by Acts 1995, 74th Leg., ch. 595, § 1, eff. Sept. 1, 1995.

### Cross References

Crime laboratory, accreditation process, see V.T.C.A., Government Code, § 411.0205.
Regulation of DNA testing, see V.T.C.A., Government Code § 411.0206.

### Administrative Code References

DNA database, see 37 TAC § 28.1 et seq.

### Library References

Criminal Law ⟨key⟩1226(1).
Searches and Seizures ⟨key⟩78.
Westlaw Topic Nos. 110, 349.

C.J.S. Criminal Law § 1734.
C.J.S. Searches and Seizures §§ 31, 103 to 106.

## § 411.145. Fees

(a) The director may collect a reasonable fee under this subchapter:

(1) for the DNA analysis of a blood sample or other specimen submitted voluntarily to the department; or

(2) for providing population statistics data or other appropriate research data.

(b) A fee collected under this section shall be deposited in the state treasury to the credit of the state highway fund, and money deposited under this section and under Article 102.020(h), Code of Criminal Procedure, may be used only to defray the cost of administering this subchapter.

Added by Acts 1995, 74th Leg., ch. 595, § 1, eff. Sept. 1, 1995. Amended by Acts 2001, 77th Leg., ch. 1490, § 1, eff. Sept. 1, 2001.

### Library References

Criminal Law ⚖1226(1).
Westlaw Topic No. 110.
C.J.S. Criminal Law § 1734.

## § 411.146. Blood Samples or Other Specimens

(a) The director may not accept a blood sample or other specimen taken from a person who is not deceased that is submitted voluntarily or as required by Section 411.148 or 411.150 unless the sample or specimen is collected in a medically approved manner by:

(1) a physician, registered nurse, licensed vocational nurse, licensed clinical laboratory technologist; or

(2) another person who is trained to properly collect blood samples or other specimens and supervised by a licensed physician.

(b) A person collecting a blood sample or other specimen under this section may not be held liable in any civil or criminal action if the person collects the sample or specimen in a reasonable manner according to generally accepted medical or other professional practices.

(c) The director shall provide at no cost to a person described by Subsection (a) the specimen vials, mailing tubes and labels, report forms, and instructions for collection of blood samples or other specimens under this section.

(d) A person who collects a blood sample or other specimen under this section shall send the sample or specimen to:

(1) the director at the department's crime laboratory; or

(2) another location as required by the director by rule.

(e) A DNA laboratory may analyze a blood sample collected under this section or other DNA specimen only:

(1) to type the genetic markers contained in the sample or specimen;

(2) for criminal justice and law enforcement purposes; or

(3) for other purposes described by this subchapter.

(f) If possible, a second DNA specimen must be obtained from a suspect in a criminal investigation if forensic DNA evidence is necessary for use as substantive evidence in the prosecution of a case.

Added by Acts 1995, 74th Leg., ch. 595, § 1, eff. Sept. 1, 1995.

### Library References

Searches and Seizures ⚖78.
Westlaw Topic No. 349.

C.J.S. Searches and Seizures §§ 31, 103 to 106.

## § 411.147. Access to DNA Database Information

(a) The director by rule shall establish procedures:

(1) to prevent unauthorized access to the DNA database; and

(2) to release DNA records, specimens, or analyses from the DNA database.

(b) The director may adopt rules relating to the internal disclosure, access, or use of a sample, specimen, or DNA record in the department or a DNA laboratory.

(c) The department may release a DNA sample, analysis, or record only:

(1) to a criminal justice agency for law enforcement identification purposes;

(2) for a judicial proceeding, if otherwise admissible under law;

(3) for criminal defense purposes to a defendant, if related to the case in which the defendant is charged; or

(4) if personally identifiable information is removed, for:

(A) a population statistics database;

(B) identification research and protocol development; or

(C) quality control.

(d) The director may release a record of the number of requests made for a defendant's DNA record and the name of the requesting person.

(e) A law enforcement agency may have access to DNA specimens through the agency's laboratory for law enforcement purposes.

(f) The director shall maintain a record of requests made under this section.

Added by Acts 1995, 74th Leg., ch. 595, § 1, eff. Sept. 1, 1995.

### Cross References

Crime laboratory, accreditation process, see V.T.C.A., Government Code, § 411.0205.
Regulation of DNA testing, see V.T.C.A., Government Code § 411.0206.

### Library References

Criminal Law ⚖1226(1).
Westlaw Topic No. 110.
C.J.S. Criminal Law § 1734.

## § 411.1471. DNA Records of Persons Charged With or Convicted of Certain Felonies

(a) This section applies to a defendant who is:

(1) indicted or waives indictment for a felony prohibited or punishable under any of the following Penal Code sections:

(A) Section 20.04(a)(4);

(B) Section 21.11;

(C) Section 22.011;

(D) Section 22.021;

(E) Section 25.02;

(F) Section 30.02(d);

(G) Section 43.05;

(H) Section 43.25; or

(I) Section 43.26;

(2) arrested for a felony described by Subdivision (1) after having been previously convicted of or placed on deferred adjudication for an offense described by Subdivision (1) or an offense punishable under Section 30.02(c)(2), Penal Code; or

(3) convicted of an offense under Section 21.07 or 21.08, Penal Code.

(b) After a defendant described by Subsection (a)(1) is indicted or waives indictment, the court in which the case is pending shall require the defendant to provide to a law enforcement agency one or more specimens for the purpose of creating a DNA record. A law enforcement agency arresting a defendant described by Subsection (a)(2), immediately after fingerprinting the defendant and at the same location as the fingerprinting occurs, shall require the defendant to provide one or more specimens for the purpose of creating a DNA record. After a defendant described by Subsection (a)(3) is convicted or placed on deferred adjudication, the court shall require the defendant to provide to a law enforcement agency one or more specimens for the purpose of creating a DNA record.

(c) A defendant described by Subsection (a)(1) or (3) may at any time voluntarily provide a specimen for the purposes described by Subsection (b).

(d) The director by rule shall require law enforcement agencies taking a specimen under this section to preserve the specimen and maintain a record of the collection of the specimen. A law enforcement agency taking a specimen under this section may use any method to take the specimen approved by the director in the rule adopted under this subsection. The rule adopted by the director must prohibit a law enforcement agency from taking a blood sample for the purpose of creating a DNA record under this section. The agency may either send the specimen to the director or send to the director an analysis of the sample performed at a laboratory chosen by the agency and approved by the director.

160

(e) Notwithstanding Subsection (d), on acquittal of a defendant described by Subsection (a)(1) or (2) or dismissal of the case against the defendant, the court shall order the law enforcement agency taking the specimen to immediately destroy the record of the collection of the specimen and require the department to destroy the specimen and the record of its receipt.

(f) A defendant who provides a specimen under this section is not required to provide a specimen under Section 411.1472 or provide a sample or specimen under Section 411.148 or 411.150 unless an attorney representing the state in the prosecution of felony offenses establishes to the satisfaction of the director that the interests of justice or public safety require that the defendant provide additional samples or specimens.

Added by Acts 2001, 77th Leg., ch. 1490, § 2, eff. Sept. 1, 2001.

### Historical and Statutory Notes

Section 8 of Acts 2001, 77th Leg., ch. 1490 provides:

"The director of the Department of Public Safety of the State of Texas, not later than January 1, 2002, shall adopt rules relating to duties imposed on law enforcement agencies under Sections 411.1471 and 411.1472, Government Code, as added by this Act."

Section 9 of Acts 2001, 77th Leg., ch. 1490 provides that this section applies to a defendant arrested on or after February 1, 2002.

### Library References

Criminal Law ⬤1226(1).
Searches and Seizures ⬤78.
Westlaw Topic Nos. 110, 349.

C.J.S. Criminal Law § 1734.
C.J.S. Searches and Seizures §§ 31, 103 to 106.

## § 411.1472. DNA Records of Persons Placed on Community Supervision for Certain Offenses

(a) This section applies to a defendant placed on community supervision, including deferred adjudication community supervision, for an offense listed in Section 411.1471(a)(1).

(b) A court that grants deferred adjudication or places a defendant on community supervision shall at the time of entering the order or making the placement require the defendant to report to a law enforcement agency to provide one or more specimens for the purpose of creating a DNA record.

(c) The director by rule shall require law enforcement agencies taking a specimen under this section to preserve the specimen and maintain a record of the collection of the specimen. A law enforcement agency taking a specimen under this section may use any method to take the specimen approved by the director in the rule adopted under this subsection. The rule adopted by the director must prohibit a law enforcement agency from taking a blood sample for the purpose of creating a DNA record under this section. The agency may either send the specimen to the director or send to the director an analysis of the sample performed at a laboratory chosen by the agency and approved by the director.

161

# TEXAS DEPARTMENT OF PUBLIC SAFETY
## PHYSICAL EVIDENCE SUBMISSION FORM



STATE'S EXHIBIT

105

PLEASE PRINT OR WRITE LEGIBLY    SEE INSTRUCTIONS ON THE BACK OF THIS FORM

DPS LABORATORY USE ONLY

| | | |
|---|---|---|
| Sero/DNA | Latents | |
| Trace | AFIS | |
| Drugs | Photo | |
| Firearms | Quest. Doc. | |
| Alcohol | Toxicology | |

**L3M 48628**

**Submission Date**
7/6/2001

| | |
|---|---|
| Investigator (Title, Name) | JOEL CASTRO, CSS |
| Agency | HIDALGO COUNTY SHERIFF'S DEPART |
| Address | P. O. BOX 359 |
| City, State | EDINBURG, TEXAS    Zip 78540 |
| Phone Number | 956-383-8114 |
| Fax Number | 956-383-4187 |

| | |
|---|---|
| Send Copy to | JOEL CASTRO, CSS |
| Agency | HIDALGO COUNTY SHERIFF'S DEPART |
| Address | P. O. BOX 359 |
| City, State | EDINBURG, TEXAS    Zip 78540 |

**Submitting Agency File Number**
01-13077

| SUSPECTS (Last, First, Middle) | Race | Sex | DOB | VICTIMS (Last, First, Middle) | Race | Sex | |
|---|---|---|---|---|---|---|---|
| MIRELES, GUSTAVO | W | M | | ROBOLLAR, MARY JANE | W | F | 6/1! |
| | | | | | | | |
| | | | | | | | |

| Offense | Date of Offense | County of Offense |
|---|---|---|
| CAPITAL MURDER | 6/23/2001 | HIDALGO |

### ITEMS OF PHYSICAL EVIDENCE SUBMITTED

| Exhibit No. (A, 1, B-3, etc.) | Item Description (Shirt, blood, etc.) | Origin (Suspect, victim, vehicle #1, residence, etc.) | Exam Requested (Compare to A, etc.) |
|---|---|---|---|
| 2 | HAIR STRANDS | REMOVED FROM RIGHT BUTTOCKS OF VICTIM AT SCENE | COMPARE TO ITEMS # 22, 38 |
| 3 | HAIR STRANDS | REMOVED FROM RIGHT SOCK OF VICTIM AT SCENE | COMPARE TO ITEMS # 22,36 |
| 4 | HIAR STRANDS | REMOVED FROM BODY OF VICTIM AT SCENE | COMPARE TO ITEMS # 22,36 |
| 5 | BLOOD STAIN LIFT | OUTSIDE PASSENGER DOOR CHEVY P/U TRUCK KANSAS LP LXE 432 | COMPARE TO ITEMS # 22,36 |
| 8 | BLOOD STAIN LIFT | BY OUTSIDE PASSENGER DOOR CHEVY P/U TRUCK KANSAS LP LXE 432 | COMPARE TO ITEMS # 22,36 |
| 13 | BLOODY SLEEVELESS ORANGE PULL-OVER TOP | REMOVED FROM BODY OF VICTIM AT AUTOPSY | SEMINAL STAINS, HAIRS. COMPARE TO ITEMS # 22,36 |
| 14 | BLOODY BLUE JEAN PANTS "LEVIS 550" W/BELT | REMOVED FROM BODY OF VICTIM AT AUTOPSY | SEMINAL STAINS, HAIRS. COMPARE TO ITEMS # 22,36 |
| 15 | BLOODY BRA | REMOVED FROM BODY OF VICTIM AT AUTOPSY | SEMINAL STAINS, HAIRS. COMPARE TO ITEMS # 22,36 |
| 16 | BLOODY WHITE PANTIES "JONES WARE" | REMOVED FROM BODY OF VICTIM AT AUTOPSY | SEMINAL STAINS, HAIRS, COMPARE TO ITEMS # 22,36 |

page 1 of 3

RECEIVE[D]

JUL 05

LABORAT[ORY]
MCAL[LEN]

Please include a brief synopsis or copy of the offense report to assist the analyst.
Submit an original and two copies (if a stamped receipt is required).

LAB-8(Rev 10-98)

Exhibit A-7 B-

# TEXAS DEPARTMENT OF PUBLIC SAFETY
## PHYSICAL EVIDENCE SUBMISSION FORM

PLEASE PRINT OR WRITE LEGIBLY    SEE INSTRUCTIONS ON THE BACK OF THIS FORM

| | |
|---|---|
| ☐ Sero/DNA ☐ Latents | **DPS LABORATORY USE ONLY** |
| ☐ Trace ☐ AFIS | |
| ☐ Drugs ☐ Photo | **L3M 48628** |
| ☐ Firearms ☐ Quest. Doc. | |
| ☐ Alcohol ☐ Toxicology | |

**Submission Date**
7/6/2001

**Investigator**
(Title, Name) JOEL CASTRO, CSS
Agency HIDALGO COUNTY SHERIFF'S DEPART
Address P. O. BOX 359
City, State EDINBURT, TEXAS    Zip 78540

Phone Number 956-383-8114
Fax Number 956-383-4187

Send Copy to JOEL CASTRO, CSS
Agency HIDALGO COUNTY SHERIFF'S DEPART
Address P. O. BOX 359
City, State EDINBURG, TEXAS    Zip 78540

Submitting Agency File Number
01-13077

| SUSPECTS (Last, First, Middle) | Race | Sex | DOB | VICTIMS (Last, First, Middle) | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| RELES, GUSTAVO | W | M | | ROBOLLAR, MARY JANE | W | F | 6/19/1 |
| | | | | | | | |
| | | | | | | | |

| Offense | Date of Offense | County of Offense |
|---|---|---|
| CAPITAL MURDER | 6/23/2001 | HIDALGO |

### ITEMS OF PHYSICAL EVIDENCE SUBMITTED

| Exhibit No. (A, 1, B53, etc.) | Item Description (Shirt, blood, etc.) | Origin (Suspect, victim, vehicle #1, residence, etc.) | Exam Requested (Compare to A, etc.) |
|---|---|---|---|
| 23 | HAIR STRANDS | INSIDE BLACK PURSE | COMPARE TO ITEMS # 23,36 |
| 24 | BLACK HANDLE SHORT PHILLIPS HEAD SCREW DRIVER | SEAT GMC P/U TRUCK TX LP J1V 790 | TRACES OF BLOOD, SKIN TISSUE, HAIR. COMPARE TO ITEMS # 23,36 |
| 25 | CLEAR AND RED HANDLE LONG FLAT HEAD SCREW DRIVER | DASHBOARD GMC P/U TRUCK TX LP J1V 790 | TRACES OF BLOOD, SKIN TISSUE, HAIR. COMPARE TO ITEMS # 23,36 |
| 26 | BLACK HANDLE STEAK KNIFE "TRAMONTINA" | FLOORBOARD GMC P/U TRUCK TX LP J1V 790 | TRACES OF BLOOD, SKIN TISSUE, HAIR. COMPARE TO ITEMS # 23,36 |
| 27 | HAIR STRANDS | FLOORBOARD GMC P/U TRUCK TX LP J1V 790 | COMPARE TO ITEMS # 23,36 |
| 28 | HAIR STRANDS | SEAT GMC P/U TRUCK TX LP J1V 790 | COMPARE TO ITEMS # 23,36 |
| 29 | BLUE IN COLOR SEAT COVER | SEAT GMC P/U TRUCK TX LP J1V 790 | COMPARE TO ITEMS # 23,36 |
| 30 | PR SPRAY PAINTED BLACK MILITARY TYPE BOOTS SIZE 11 # SS070 | NUECES COUNTY DETENTION CENTER INMATE GUSTAVO MIRELES PROPERTY | TRACES OF BLOOD, SKIN TISSUE, HAIR. COMPARE TO ITEMS # 23,36 |
| 31 | GRAY PULL-OVER POLO TYPE T-SHIRT "PREMIRE" SIZE L | NUECES COUNTY DETENTION CENTER INMATE GUSTAVO MIRELES PROPERTY | TRACES OF BLOOD, SKIN TISSUE, HAIR. COMPARE TO ITEMS # 23,36 |

page 2 of 3

RECEIVED

JUL 05 2001

LABORATORIES
MCALLEN

Please include a brief synopsis or copy of the offense report to assist the analyst.
Submit an original and two copies (if a stamped receipt is required).

Rev (6/99)

# TEXAS DEPARTMENT OF PUBLIC SAFETY
# PHYSICAL EVIDENCE SUBMISSION FORM

PLEASE PRINT OR WRITE LEGIBLY    SEE INSTRUCTIONS ON THE BACK OF THIS FORM

**DPS LABORATORY USE ONLY**

| | | |
|---|---|---|
| ☐ Sero/DNA | ☐ Latents | |
| ☐ Trace | ☐ AFIS | |
| ☐ Drugs | ☐ Photo | **L3M 48628** |
| ☐ Firearms | ☐ Quest. Doc. | |
| ☐ Alcohol | ☐ Toxicology | |

Submission Date
**7/6/2001**

| Investigator (Title, Name) | JOEL CASTRO, CSS | | Send Copy to | JOEL CASTRO, CSS |
|---|---|---|---|---|
| Agency | HIDALGO COUNTY SHERFF'S DEPART | | Agency | HIDALGO COUNTY SHERIFF'S DEPART |
| Address | P. O. BOX 359 | | Address | P. O. BOX 359 |
| City, State | EDINBURG, TEXAS  Zip 78540 | | City, State | EDINBURG, TEXAS  Zip 78540 |

Phone Number    956-383-8114

Fax Number    956-383-4187

Submitting Agency File Number

01-13077

| SUSPECTS (Last, First, Middle) | Race | Sex | DOB | VICTIMS (Last, First, Middle) | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| MIRELES, GUSTAVO | W | M | | ROBOLLAR, MARY JANE | W | F | 6/19/1( |
| | | | | | | | |
| | | | | | | | |

| Offense | Date of Offense | County of Offense |
|---|---|---|
| CAPITAL MURDER | 6/23/2001 | HIDALGO |

## ITEMS OF PHYSICAL EVIDENCE SUBMITTED

| Exhibit No. (A, 1, BB3, etc.) | Item Description (Shirt, blood, etc.) | Origin (Suspect, victim, vehicle #1, residence, etc.) | Exam Requested (Compare to A, etc.) |
|---|---|---|---|
| 32 | BLUE DENIM JEANS "OPEN THAD" W/STAINS SIZE 38X32 | NUECES COUNTY DETENTION CENTER INMATE GUSTAVO MIRELES PROPERTY | TRACES OF BLOOD, SKIN TISSUE, HAIR. COMPARE TO ITEMS # 23,36 |
| 34 | WHITE IN COLOR FTL UNDERWEAR | NUECES COUNTY DETENTION CENTER INMATE GUSTAVO MIRELES PROPERTY | TRACES OF BLOOD, SKIN TISSUE, HAIR. COMPARE TO ITEMS # 23,36 |
| 35 | HAIR STRAND | RIGHT PANTS LEG OF BLUE DENIM JEANS ITEM # 32 | COMPARE TO ITEMS # 23,36 |
| 42A 42B | ORANGE HANDLE SCREWDRIVER, RUSTED DRILL BIT | S/E BEDROOM INSIDE TV CONSOLE FM 43 & 763, CORPUS CHRISTI | TRACES OF BLOOD, SKIN TISSUE, HAIR. COMPARE TO ITEMS # 23,36 |
| 46 | SERATED KITCHEN KNIFE WITH BLACK HANDLE | TOP BEDROOM N/E CORNER OF RESIDENCE E OF TOWER ON ELGATO, ALAMO | TRACES OF BLOOD, SKIN TISSUE, HAIR. COMPARE TO ITEMS # 23,36 |
| 22 | SEXUAL ASSAULT EVIDENCE COLLECTION KIT | REMOVED FROM BODY OF VICTIM AT AUTOPSY | SEMINAL STAINS, FOREIGN HAIR, TISSUE. COMPARE TO ALL SUBMITTED ITEMS |
| 36 | SUSPECT EVIDENCE COLLECTION KIT | REMOVED FROM BODY OF SUSPECT AT NUECES COUNTY DETENTION CENTER | COMPARE TO ALL SUBMITTED ITEMS |

**RECEIVED**

**JUL 0 5 2001**

page 3 of 3

LABORATORIES
MCALLEN

Please include a brief synopsis or copy of the offense report to assist the analyst.
Submit an original and two copies (if a stamped receipt is required).

# TEXAS DEPARTMENT OF PUBLIC SAFETY

*Look →*  *← Look*

**TEXAS DPS FIELD CRIME LABORATORY**
P.O. BOX 819
MCALLEN, TEXAS 78505-0819
Voice 956-984-5600  Fax 956-984-5713

*This is what was used to Convict me.*

**THOMAS A. DAVIS, JR.**
DIRECTOR
FRANKIE WALLER
DAVID McEATHRON
ASST. DIRECTORS

December 12, 2001

**COMMISSION**
COLLEEN McHUGH
CHAIRMAN

ROBERT B. HOLT
JAMES B. FRANCIS,
COMMISSIONERS

Joel Castro
Hidalgo County Sheriff's Office
Box 359
Edinburg, Texas 78540-0359

| Laboratory Case Number | Agency Case Number | Offense Date |
|---|---|---|
| L3M- 48628 | 0113077 | 06/23/01 |

**Suspect(s)**
Mireles, Gustavo

**Victim(s)**
Robollar, Mary Jane 06-19-60

**Offense:** Homicide
**County of Offense:** Hidalgo (108)

**Evidence Submitted**
Refer to results of analysis.

**Requested Analysis**
Determine the presence of semen, blood, foreign hair and any significant trace evidence. Compare using DNA analysis.

**Results of Analysis**
On July 6, 2001, in person by Joel Castro:

| ITEM | DESCRIPTION | ORIGIN | RESULTS |
|---|---|---|---|
| 2 | Hair strands | Victim's right buttock | No DNA was recovered from three hairs tested. Apparent burned tissue was observed. |
| 3 | Hair strands | Victim's right sock | Three hairs were observed. Two hairs were visually similar to the victim's pubic hair standard. The hairs were not collected. The third hair was recovered for DNA analysis. The victim cannot be excluded as the contributor of the DNA. See DNA results. The suspect is excluded as the contributor. |
| 4 | Hair strand | Victim's body | Visually similar to victim's head hair standard. Apparent tissue tested positive for apparent blood. No further analysis was done. |
| 5 | Bloodstain lift | Outside passenger door of Chevy P/U Kansas L. P. LXE 432 | The apparent bloodstain was determined to be of human origin. The DNA profile is consistent with the suspect. See DNA results. |
| 6 | Bloodstain lift | Outside passenger door of Chevy P/U Kansas L. P. LXE 432 | The apparent bloodstain was determined to be of human origin. The DNA profile is consistent with the suspect. See DNA results. |

*All this hairs found on victims body none of them match me, what a coincidence that the two that they say were find in the purse do match will BS*

Laboratory Case Number
L3M- 48628

Agency Case Number
0113077

Offense Date
06/23/01

| ITEM | DESCRIPTION | ORIGIN | RESULTS |
|---|---|---|---|
| 13 | Pullover top | Victim | No acid phosphatase, a non-specific constituent of semen, was detected on the apparent bloody pullover top. A tape-lift of the shirt was done and returned with the item. If fiber analysis is needed contact this laboratory. |
| 14 | Jeans | Victim | An apparent bloodstain was determined to be of human origin. The DNA profile is consister with the suspect. See DNA results. No acid phosphatase was detected on the jeans. Apparent fecal matter was observed. |
| 15 | Bra | Victim | No DNA was recovered from an apparent bloodstain. No acid phosphatase was detected. Head hair visually similar to the victim's head hair standard was observed. |
| 16 | Panty | Victim | No acid phosphatase was detected. Apparer fecal matter was observed. |
| 23 | Hair strands | Black purse | Three hairs visually similar to the suspect's pubic hair standard were recovered. Two of the three hairs were DNA tested (Hairs 1 and 2). The third hair was collected but not tested (Hair 3). One hair whose origin could not be determined was DNA tested (Hair 4). Two hair fragments visually similar to victim's hea hair standard were observed and not collected. The DNA profiles from Hairs 1 and 4 are consistent with the suspect. See DNA result No DNA was recovered from Hair 2. |
| 24 | Phillips screwdriver | Seat GMC P/U TX L.P. JIV 790 | No blood was detected. No significant trace evidence was observed. |
| 25 | Flat head screwdriver | Dashboard GMC P/U TX L.P. JIV 790 | No blood was detected. No significant trace evidence was observed. |
| 26 | Steak knife | Floorboard GMC P/U TX L. P. JIV 790 | No blood was detected. No significant trace evidence was observed. |
| 27 | Hair strands | Floorboard GMC P/U TX L. P. JIV 790 | Four hairs visually similar to the suspect's head hair standard were observed. One hai was collected. If further analysis is needed contact this laboratory. Six hairs visually dissimilar to the victim and suspect's head a pubic hair standards were observed and no collected. Apparent animal hairs were observed and not collected. Plant-like substance was observed and not collected. |

*Handwritten annotations:*
- (next to item 13) No blood of mine detected on bloody top, but yet 1 drop on jeans . it's all B/S
- (next to item 15) Again more blood not mine

| ITEM | DESCRIPTION | ORIGIN | RESULTS |
|---|---|---|---|
| 13 | Pullover top | Victim | No acid phosphatase, a non-specific constituent of semen, was detected on the apparent bloody pullover top. A tape-lift of the shirt was done and returned with the item. If fiber analysis is needed contact this laboratory. |

*No blood of mine detected on bloody top, but yet 1 drop on Jeans. it's all B/S*

| 14 | Jeans | Victim | An apparent bloodstain was determined to be of human origin. The DNA profile is consistent with the suspect. See DNA results. No acid phosphatase was detected on the jeans. Apparent fecal matter was observed. |

| 15 | Bra | Victim | No DNA was recovered from an apparent bloodstain. No acid phosphatase was detected. Head hair visually similar to the victim's head hair standard was observed. |

*Again more blood not mine*

| 16 | Panty | Victim | No acid phosphatase was detected. Apparent fecal matter was observed. |

| 23 | Hair strands | Black purse | Three hairs visually similar to the suspect's pubic hair standard were recovered. Two of the three hairs were DNA tested (Hairs 1 and 2). The third hair was collected but not tested (Hair 3). One hair whose origin could not be determined was DNA tested (Hair 4). Two hair fragments visually similar to victim's head hair standard were observed and not collected.

The DNA profiles from Hairs 1 and 4 are consistent with the suspect. See DNA results.

No DNA was recovered from Hair 2. |

| 24 | Phillips screwdriver | Seat GMC P/U TX L.P. JIV 790 | No blood was detected. No significant trace evidence was observed. |

| 25 | Flat head screwdriver | Dashboard GMC P/U TX L.P. JIV 790 | No blood was detected. No significant trace evidence was observed. |

| 26 | Steak knife | Floorboard GMC P/U TX L. P. JIV 790 | No blood was detected. No significant trace evidence was observed. |

| 27 | Hair strands | Floorboard GMC P/U TX L. P. JIV 790 | Four hairs visually similar to the suspect's head hair standard were observed. One hair was collected. If further analysis is needed contact this laboratory. Six hairs visually dissimilar to the victim and suspect's head and pubic hair standards were observed and not collected. Apparent animal hairs were observed and not collected. Plant-like substance was observed and not collected. |

| ITEM | DESCRIPTION | ORIGIN | RESULTS |
|---|---|---|---|
| 22B | Two vaginal swabs | Victim | No semen was detected on the apparent bloody vaginal swab. |
| 22C | Vaginal smear | Victim | No spermatozoa, a semen-specific constituent, were observed. |
| 22D | Two rectal swabs | Victim | No semen was detected. |
| 22E | Rectal smear | Victim | No spermatozoa were observed. |
| 22F | Two oral swabs | Victim | No semen was detected on the apparent bloody oral swabs. |
| 22G | Oral smear | Victim | No spermatozoa were observed on the apparent bloody oral smear. |
| 22H | Head hair | Victim | Used as standard. |
| 22I | Head hair combing | Victim | No apparent foreign hair was recovered. |
| 22J | Pubic hair | Victim | Used as standard. |
| 22K | Pubic hair combing | Victim | No apparent foreign hair was recovered. Red apparent fibers were observed. |
| 22L | Fingernail scrapings | Victim | Apparent blood was detected and was determined to be of human origin. The victim cannot be excluded as the DNA contributor. See DNA results. The suspect is excluded as the contributor. Hairs visually similar to the victim's head hair standard were observed and not collected. |
| 36 | Evidence collection kit | Suspect | |
| 36A | Purple top blood tube | Suspect | Used as known standard. |
| 36B | Yellow top blood tube | Suspect | No analysis done. |
| 36C | Head hairs | Suspect | Used as standard. |
| 36D | Pubic hairs | Suspect | Used as standard. |

**DNA Results:**

Three hairs from the victim's right buttock (#2); one hair from the victim's right sock (#3); two bloodstains outside passenger door of Chevy P/U, Kansas L. P. LXE 432 (#5), (#6); a bloodstain from the victim's jean (#14); stain from the victim's bra (#15); blood from the victim's fingernail scrapings (#22L); three hairs from the black purse (#23); one hair from the floorboard GMC P/U TX L. P. JIV 790 (#28); three bloodstains fro the seat cover GMC P/U TX L.P. JIV (#29); hair from the jeans (#35); seat cover GMC P/U, TX L. P. JIV 790; suspect's pullover shirt (#31), jeans (#32); stains from suspect's boots (#30A), (#30B); victim's blood (#22A), and suspect's blood (#36A) were subjected to STR PCR DNA analysis and the following loci were characterized: D3S1358, VWA, FGA, Amelogenin, D8S1179, D21S11, D18S51, D5S818, D13S317 and D7S820.

The DNA profiles from the two bloodstains outside the door of Chevy P/U (#5 and #6), bloodstain from the victim's jeans (#14) and one hair from the black purse (#23 hair 1), are consistent with the suspect, Gustavo Mireles. Gustavo Mireles cannot be excluded as the contributor. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 1,168,000,000,000 for Caucasians, 1 in 301,700,000,000,000 for Blacks and 1 in 147,300,000,000 for Hispanics. The approximate world population is 6,000,000,000.

The DNA profile from a second hair from the black purse (item #23 hair 4) is consistent with the DNA profile of the suspect, Gustavo Mireles. Gustavo Mireles cannot be excluded as the contributor at the loci Amelogenin, D8S1179, D21S11, and D7S820. At these loci the probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 34,230 for Caucasians, 1 in 181,900 for Blacks and 1 in 24,180 for Hispanics. The approximate world population is 6,000,000,000.

The DNA profiles obtained from the hair from the victim's sock (#3) and blood from the victim's fingernail scrapings (#22L) are consistent with the DNA profile of the victim, Mary Jane Robollar. Mary Jane Robollar cannot be excluded as the contributor at the loci Amelogenin and D8S1179. At these loci the probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 28 for Caucasians, 1 in 9 for Blacks and 1 in 14 for Hispanics. The approximate world population is 6,000,000,000. The suspect is excluded as the contributor of the hair from the victim's sock and blood from the victim's fingernail scrapings.

No DNA profile foreign to the suspect was obtained from the suspect's shirt (#31) or jeans (#32).

No DNA profile was obtained from items #2, #15, #23 hair 2, #28, #29, #30A, #30B or #35.

The evidence is being retained. Please make arrangements to pick it up as soon as possible.

Orlando Ochoa
Criminalist
Texas DPS McAllen Laboratory

RECEIVED
DEC 17 2001
HIDALGO COUNTY SHERIFF'S DEPT.
EDINBURG. TEXAS

12/12/01



-50-

testing. What's to say that wasn't affected?"

DPS meantime, maintains that they did not try to conceal the lab closure. They have reviewed 40 cases so far, and have found no evidence of faulty testing. They must still scrutinize about 187 more.

Alex Madrigal, the lab chief primarily responsible for DNA testing has since been suspended with pay.





All content © Copyright 2000 - 2004 WorldNow and KGBT. All Rights Reserved.
For more information on this site, please read our Privacy Policy and Terms of Service.



Publication: Freedom - The Monitor; Date: Mar 17, 2004; Section: Front Page; Page: 1

# Review: 40 crime lab cases accurate

**By SARAH OVASKA and RYAN GABRIELSON Monitor Staff Writers sovaska@themonitor.com rgabrielson@themonitor.com**

McALLEN â€" A McAllen-based **DNA** crime lab found no problems in a re-examination of 40 cases despite inconsistencies in maintaining police evidence that caused the labâ€™s closure for three months last summer.

The Texas Department of Public Safety Criminal Laboratory, located in McAllen, reviewed 40 **DNA** samples and found no erroneous results or mistakes. However, a much larger review is currently under way, with 187 **DNA** samples scheduled for re-examination and retesting, according to a DPS representative.

The lab analyzes **DNA** evidence, found in blood, saliva and semen, for a number of police agencies in the area.

The McAllen crime lab was shut down from June 16 to Sept. 23, 2003, with no notice given to local prosecutors, police agencies c defense attorneys. The evidence submitted during that time was dispersed throughout the agenciesâ€™ other crime labs. After staff was retrained this summer, the lab is back up and running, according to a press release from DPS.

"We donâ€™t know exactly what the issue was with the lab," said Victor Rodriguez, the McAllen police chief. "Weâ€™ve not seen any unusual changes in the response time."

With response times up to six months for some tests, Rodrigue: said his officers and investigators continued to drop off evidence at the crime lab across the street from the police station, and were unaware that the labâ€™s operations had been shut down

Rodriguez said his department might now bring **DNA** evidence to a private company.

The DPS shut down the lab after a June 3 internal audit which found serious procedural flaws. The flaws included sexual-assault kits which were not adequately sealed, chemical reagents for **DNA** testing that were not labeled or had expired and the reuse of chemicals in **DNA** testing, according to an investigation published Monday by the Houston Chronicle.

The suspended head of the **DNA** lab, Alejandro "Alex" Madrigal, told the Chronicle that approximately 300 cases were under review for possible mishandling of evidence.

The Monitor was unable to reach Madrigal for this article.

Some defense attorneys said they were concerned with the information, but said very few cases rest solely on **DNA** evidence

"It **(DNA)** doesn't come up that often," said Jaime Aleman, criminal defense attorney with a number of capital murder cases "Ninety percent of the cases still go back to the old-fashioned evidence" like eyewitnesses or circumstantial evidence.

Aleman said the problems at the **DNA** lab may highlight for the public what those who work with criminal defendants already know.

"The default mode is to believe a police officer," Aleman said. "We in our profession know that mistakes are made."

Meanwhile, other defense attorneys said they doubted any cas would be thrown out based on the **DNA** lab's problems.

"In the 300 cases (being reevaluated), not all 300 were innoce

...egin with," said Rick Salinas, a Mission-based criminal defense
...orney.

However, Salinas said he was disappointed to hear about
inconsistencies at the crime lab.

"These are professionals and they get good money," Salinas said
"To think that 300 cases (might) have been mishandled,
that's ridiculous."

Prosecutors in the Hidalgo County District Attorney's Offi...
are not concerned about the closure of the **DNA** lab.

"For the time being, it may be too early for me to be conce...
about any problems alleged out of the media," said Distric...
Attorney Rene Guerra. " Until we see an official report tha...
they're not standing by the results (from the original
**DNA** testing) — then we have to worry about it."

Guerra said sexual assault cases, more than any othe...
cases, depend heavily on **DNA** evidence.

The high-profile capital murder cases of 14 alleged
Bomber gang members in relation to the Sept. 5, 2...
four women in Donna and the Jan. 5, 2003, massa...
Edinburg men weren't affected by the testing ...
Joseph Orendain, the assistant district attorney ...
cases. No **DNA** evidence was used in the case o...
Gene Garza, one of the Tri-City Bombers who ...
death in December, Orendain said.

"Especially on a capital case, we're not ...
penalty with the link being **DNA**," Orendain...
for a death penalty, we want to have more...
evidence."

However, one local attorney said he will...

drop the charges against his client based on the questions surrounding the **DNA** lab. Juan Tostado is accused of killing Lee Roy Rosales in 1993. Tostado, a convicted drug smuggler, was the last person seen with Rosales, according to Monitor archives Rosales' body was found in a San Juan canal.

**Hector Villarreal,** an Edinburg attorney, was retained a week ago to defend Tostado, whose trial is scheduled for March 29.

"Anything having to do with DPS and the Texas Rangers is suspect," **Villarreal** said. "We need a federal investigation of D and the Rangers."

However, the **DNA** evidence in Tostado's case was analyze in 1997 by Dallas-based Gene-Screen **DNA** labs, said Sgt. Israe Pacheco, the Texas Ranger who investigated the case.

"He **(Villarreal)** needs to become more familiar with his client's case before he starts criticizing the evidence," Pach said.

Pacheco added that the audit results on the **DNA** lab are not t big a deal.

"That's the point of an audit, invariably you're always going to find some shortcomings," Pacheco said. "When the du settles, the results are going to be the same."

———Sarah Ovaska covers courts and general assignmen for The Monitor. You can reach her at (956) 683-4445.

———Ryan Gabrielson covers Pharr, San Juan, Alamo anc general assignments for The Monitor. You can reach him at (9 683-4462.

Publication: Freedom - The Monitor; Date: Apr 22, 2004; Section: Valley & State Continued; Page: 13


# Four to be questioned about **McAllen DNA lab**
**By DANIEL PERRY Monitor Staff Writer dperry@themonitor.com**

AUSTIN â€" Four subpoenaed Texas Department of Public Safety employees in **McAllen** must give depositions regarding the cityâ€™s troubled **DNA** criminal laboratory.

The employees, whose names were unavailable late Wednesday afternoon, will appear at a future meeting of the House Committee on General Investigating in Austin.

"There were some allegations made that the **lab** in the (Rio Grande) Valley in part was having problems, but that is all I can tell you right now," said Rep. Terry Keel, R-Austin, a committee member.

The committee met Tuesday and heard from two DPS **lab** employees in a private session.

The laboratory was **closed** from June 16, 2003, to Sept. 23, 2003, but no law enforcement agencies, defense attorneys or prosecutors were notified. The **closing** stemmed from a departmental audit that found problems with how chemicals for **DNA** testing and sexual assault kits were handled.

Forty cases were re-examined by DPS earlier this year and found not to have any problems. At least 150 cases were still being revisited, according to DPS information.

â€"â€"â€"Daniel Perry covers **McAllen,** Hidalgo and general

assignments for The Monitor. You can reach him at (956)

683-4454.

## HPD crime lab

March 15, 2004, 12:14PM

### DPS secretly shuttered DNA lab

State rep troubled by lack of transparency during review

By STEVE MEYCZK
Copyright 2004 Houston Chronicle

For more than three months last year, the Texas Department of Public Safety, which oversees the accreditation of all public DNA labs in the state, quietly shut down the DNA division of its own regional crime lab in McAllen.

During that time, the DPS began a review of perhaps as many as 300 criminal cases but chose not to notify most of the prosecutors or police, and none of the defendants or defense attorneys, involved in those cases, the Houston Chronicle has learned.

News of the state agency's ongoing scrutiny of its own lab, and its decision to keep quiet about the probe, disturbed a state lawmaker who last year sponsored legislation regulating public DNA laboratories.

"It makes you wonder if they are capable of running it and whether or not they're giving us full information," said Rep. Kevin Bailey, D-Houston.

In response to the closure of DNA labs in Houston and Fort Worth within months of each other last year, Bailey, the chairman of the House Committee on General Investigating, sponsored a law requiring that all public DNA labs in the state be accredited by September 2005.

The law also gives the DPS responsibility for overseeing that process. But now a frustrated Bailey wonders if the agency is up to the task.

"We're going to have to take a hard look at DPS," he said. "I don't know if they're not doing their job properly or they're trying to hide information. It goes back to the old issue that people's lives are at stake and no one seems to care."

The McAllen DNA lab was temporarily closed after an internal performance audit exposed a number of problems. The staff was retrained during the shutdown, but the head of the lab has been suspended with pay because the lab's performance did not improve afterward, a DPS spokesperson said.

But Alejandro "Alex" Madrigal, who was in charge of the McAllen DNA lab until his Feb. 24 suspension, says he never received any retraining and believes he was suspended because he contested many of the findings of the DPS team that inspected his lab.

Madrigal, a 14-year veteran of the lab, says he expects to be fired soon. His situation could affect a murder trial scheduled to begin next week in Hidalgo County, one of the South Texas counties served by the McAllen DPS crime lab.

Statewide DPS crime lab chief Ron Urbanovsky could not be reached for comment.

The McAllen DNA lab was shuttered from June 16 to Sept. 26. DPS auditors cited numerous problems that led to the closure:

· Sexual assault kits awaiting analysis were not properly sealed.

· Chemical reagents used in DNA tests were not properly labeled and one had expired.

· The sensitivity of the instrument used to determine DNA profiles was not established before doing casework on evidence.

· A chemical in a DNA test kit used to assign the identity of genetic markers in case samples was reused in violation of standard operating procedures.

· Samples that gave no DNA profiles were not documented.

· The disposition of evidence was not properly reported.

The Chronicle obtained a copy of the McAllen report, dated July 23, 2003, after requesting copies of all DPS lab audits performed last year.

However, the McAllen report was not included in the original group of documents sent to the Chronicle. Asked about the omission, DPS senior assistant general counsel Pamela Smith said she was not sure whether the report had been completed.

The state agency did not provide the Chronicle with a copy of the McAllen audit until the newspaper's attorney, Joseph Larson, threatened to file a complaint with the Texas Attorney General's Office.

In an interview at his attorney's office last week, the suspended lab chief, Madrigal,

acknowledged the problems reported by the DPS auditors, but did not agree on their severity. He also maintained that, after most audits, DPS lab workers are given a chance to correct the flaws.

"For example, the temperature in the refrigerator (where rape kits are stored) is 40 degrees," Madrigal said. "Sometimes a seal becomes brittle and breaks off. We go back and reseal them. Usually, the auditors just do a few random checks. This time they were determined to find something because they emptied the refrigerator."

A DPS analyst not involved in the audit said that, while most of the problems cited by the auditors are not critical, the failure of McAllen analysts to know the sensitivity of the instrument used to determine DNA profiles could have led to faulty test results.

"If you don't know the sensitivity of the instrument you're using, then you're just guessing (about the results)," said the DNA analyst, who spoke to the Chronicle on the condition of anonymity.

However, Madrigal said the internal audit did not consider the fact that the McAllen lab was using — and had been given permission to use — an older protocol than the one the agency currently uses with regard to the instrument.

"This is not a valid (audit) finding because we were under the old SOP (standard operating procedure)," said Madrigal. "They were trying to force us to use the new SOP, but we were grandfathered because our instruments were (old)."

Madrigal also points out that from 1999 through 2002 his performance evaluations noted that his knowledge of his job exceeded the standards of the department.

If, as Madrigal assumes, he is fired soon, that could pose problems for prosecutors in a Hidalgo County murder case set for trial next week. Juan Tostado, a convicted drug dealer, is charged with the 1993 slaying of Leroy Rosales.

According to Assistant District Attorney William McPherson, DNA analysis of the victim's blood found in the suspect's house and car will play a large role in the prosecution, although it will not be McPherson's only evidence.

Much of the DNA evidence in the case was processed by Madrigal. However, until they were contacted by the Chronicle, neither McPherson nor his boss, District Attorney Rene Guerra, knew about the closure of the McAllen lab, the review of evidence analyzed there or Madrigal's suspension.

"I've not heard that and I would want to know about that," McPherson said. "And, apparently (because of) what you're bringing to my attention, I'm going to have to call the head (of the lab) over there ... (because) we weren't notified."

DPS spokeswoman Tela Mange said that during the three-month closure, work that normally would have been handled by the McAllen DNA lab was sent to other DPS labs around the state.

Madrigal says that he and other lab workers were told to tell law enforcement officials that the work was being diverted to other labs because of a backlog at the McAllen lab, not because it was closed.

Additionally, when first contacted about the McAllen situation, Mange said she had understood that the audit and lab closure had resulted in the review of only about 100 cases. However, when told of Madrigal's estimate that about 300 had been scrutinized, Mange acknowledged that he could be correct.

"They may be going back and reviewing additional cases as part of the internal investigation," she said.

Mange also confirmed that the DPS did not notify most law enforcement officials who do business with the McAllen lab about the problems there.

"I think (we) may have contacted one of the prosecutors, but none of the things that we have found would change or affect the outcome of any cases," she said.

But according to the immediate past president of the Harris County Criminal Defense Lawyers Association, the DPS had a duty to notify everyone involved with the cases.

"They've got a constitutional duty to disclose that information (to the defendant)," said Houston attorney Troy McKinney. "Anyone who had a case in the batch that they were reviewing, anyone who had an ongoing case, was constitutionally entitled to know that."

Indeed, one local detective, who asked not to be identified, said law enforcement officials also would have wanted to be informed about the situation.

"It's like asking, if I had cancer, would I want to know about it," said the law officer. "Of course I would, so I could do something about it."

VOICES OF HOUSTON

Readers are solely responsible for the content of the comments they post here. Comments are subject to the site's terms and conditions of use and do not necessarily reflect the opinion or approval of the Houston Chronicle.

-22-



## NCADP National Coalition to Abolish the Death Penalty

| |
|---|
| EXECUTION ALERTS |
| NEWS ARCHIVES |
| PRESS RELEASES |
| FACTS & FIGURES |
| LIFELINES |
| YOUTH ACTIVISM |
| EVENT CALENDAR |
| AFFILIATES |
| 2005 CONFERENCE |
| HOME |

Join Our E-mail List



**NEWS HEADLINE**

**TEXAS: DPS SECRETLY CLOSED DNA LAB – SENATOR TROUBLED BY LACK OF TRANSPARENCY**

MARCH 15, 2004

For more than 3 months last year, the Texas Department of Public Safety, which oversees the accreditation of all public DNA labs in the state, quietly shut down the DNA division of its own regional crime lab in McAllen.

During that time, the DPS began a review of perhaps as many as 300 criminal cases but chose not to notify most of the prosecutors or police, and none of the defendants or defense attorneys, involved in those cases, the Houston Chronicle ha learned.

News of the state agency's ongoing scrutiny of its own lab, and its decision to keep quiet about the probe, disturbed a state lawmaker who last year sponsored legislation regulating public DNA laboratories.

"It makes you wonder if they are capable of running it and whether or not they're giving us full information," said Rep. Kevin Bailey, D-Houston.

In response to the closure of DNA labs in Houston and Fort Worth within months of each other last year, Bailey, the chairman of the House Committee on General Investigating, sponsored a law requiring that all public DNA labs in the state be accredited by September 2005.

The law also gives the DPS responsibility for overseeing that process. But now a frustrated Bailey wonders if the agency is up to the task.

"We're going to have to take a hard look at DPS," he said. "I don't know if they're not doing their job properly or they're tryir to hide information. It goes back to the old issue that people's lives are at stake and no one seems to care."

The McAllen DNA lab was temporarily closed after an internal performance audit exposed a number of problems. The staf was retrained during the shutdown, but the head of the lab has been suspended with pay because the lab's performance d not improve afterward, a DPS spokesperson said.

But Alejandro "Alex" Madrigal, who was in charge of the McAllen DNA lab until his Feb. 24 suspension, says he never received any retraining and believes he was suspended because he contested many of the findings of the DPS team that inspected his lab.

Madrigal, a 14-year veteran of the lab, says he expects to be fired soon. His situation could affect a murder trial scheduled to begin next week in Hidalgo County, one of the South Texas counties served by the McAllen DPS crime lab.

Statewide DPS crime lab chief Ron Urbanovsky could not be reached for comment.

The McAllen DNA lab was shuttered from June 16 to Sept. 26. DPS auditors cited numerous problems that led to the closure:

7 Sexual assault kits awaiting analysis were not properly sealed.

7 Chemical reagents used in DNA tests were not properly labeled and one had expired.

7 The sensitivity of the instrument used to determine DNA profiles was not established before doing casework on evidence

7 A chemical in a DNA test kit used to assign the identity of genetic markers in case samples was reused in violation of standard operating procedures.

7 Samples that gave no DNA profiles were not documented.

7 The disposition of evidence was not properly reported.

The Chronicle obtained a copy of the McAllen report, dated July 23, 2003, after requesting copies of all DPS lab audits performed last year.

However, the McAllen report was not included in the original group of documents sent to the Chronicle. Asked about the omission, DPS senior assistant general counsel Pamela Smith said she was not sure whether the report had been completed.

The state agency did not provide the Chronicle with a copy of the McAllen audit until the newspaper's attorney, Joseph Larson, threatened to file a complaint with the Texas Attorney General's Office.

In an interview at his attorney's office last week, the suspended lab chief, Madrigal, acknowledged the problems reported t the DPS auditors, but did not agree on their severity. He also maintained that, after most audits, DPS lab workers are given a chance to correct the flaws.

"For example, the temperature in the refrigerator (where rape kits are stored) is 40 degrees," Madrigal said. "Sometimes a seal becomes brittle and breaks off. We go back and reseal them. Usually, the auditors just do a few random checks. This time they were determined to find something because they emptied the refrigerator."

-23-

A DPS analyst not involved in the audit said that, while most of the problems cited by the auditors are not critical, the failure of McAllen analysts to know the sensitivity of the instrument used to determine DNA profiles could have led to faulty test results.

"If you don't know the sensitivity of the instrument you're using, then you're just guessing (about the results)," said the DNA analyst, who spoke to the Chronicle on the condition of anonymity.

However, Madrigal said the internal audit did not consider the fact that the McAllen lab was using – and had been given permission to use – an older protocol than the one the agency currently uses with regard to the instrument.

"This is not a valid (audit) finding because we were under the old SOP (standard operating procedure)," said Madrigal. "They were trying to force us to use the new SOP, but we were grandfathered because our instruments were (old)."

Madrigal also points out that from 1999 through 2002 his performance evaluations noted that his knowledge of his job exceeded the standards of the department.

If, as Madrigal assumes, he is fired soon, that could pose problems for prosecutors in a Hidalgo County murder case set for trial next week. Juan Tostado, a convicted drug dealer, is charged with the 1993 slaying of Leroy Rosales.

According to Assistant District Attorney William McPherson, DNA analysis of the victim's blood found in the suspect's house and car will play a large role in the prosecution, although it will not be McPherson's only evidence.

Much of the DNA evidence in the case was processed by Madrigal. However, until they were contacted by the Chronicle, neither McPherson nor his boss, District Attorney Rene Guerra, knew about the closure of the McAllen lab, the review of evidence analyzed there or Madrigal's suspension.

"I've not heard that and I would want to know about that," McPherson said. "And, apparently (because of) what you're bringing to my attention, I'm going to have to call the head (of the lab) over there ... (because) we weren't notified."

DPS spokeswoman Tela Mange said that during the 3-month closure, work that normally would have been handled by the McAllen DNA lab was sent to other DPS labs around the state.

Madrigal says that he and other lab workers were told to tell law enforcement officials that the work was being diverted to other labs because of a backlog at the McAllen lab, not because it was closed.

Additionally, when first contacted about the McAllen situation, Mange said she had understood that the audit and lab closu had resulted in the review of only about 100 cases. However, when told of Madrigal's estimate that about 300 had been scrutinized, Mange acknowledged that he could be correct.

"They may be going back and reviewing additional cases as part of the internal investigation," she said.

Mange also confirmed that the DPS did not notify most law enforcement officials who do business with the McAllen lab about the problems there.

"I think (we) may have contacted one of the prosecutors, but none of the things that we have found would change or affe the outcome of any cases," she said.

But according to the immediate past president of the Harris County Criminal Defense Lawyers Association, the DPS had duty to notify everyone involved with the cases.

"They've got a constitutional duty to disclose that information (to the defendant)," said Houston attorney Troy McKinney. "Anyone who had a case in the batch that they were reviewing, anyone who had an ongoing case, was constitutionally entitled to know that."

Indeed, one local detective, who asked not to be identified, said law enforcement officials also would have wanted to be informed about the situation.

"It's like asking, if I had cancer, would I want to know about it," said the law officer. "Of course I would, so I could do something about it."

*source: Houston Chronicle*



LEVEL TEN HITCOUNTER
by LevelTen Design

**HARRY J. BONNELL, M.D.**
4n6Pathology, Inc.
6910 Monte Verde Drive
San Diego, California 92119-1511

Office/Fax: 619 698 6388                    www.4n6Pathology.com

16 December 2013

Gustavo L. Mireles, # 1128895
McConnell Unit
3001 S. Emily Drive
Beeville, Texas 78102

Dear Mr. Mireles:

I have received and reviewed the materials provided by you regarding the DNA analysis process in your case. In light of recent legislation in Texas regarding appeals based on outdated or now disproven forensic science, I have made copies of your materials for myself and forwarded the rest on to the innocence projects, address below. I'm not sure whose territory you are in – Austin or Houston.

It is obvious to me that the methodology used was defective and certainly is below currently acceptable forensic standards; I don't believe it met forensic standards when it was done in 2001. It should have been challenged if your attorney was competent. It should go well on appeal if the Innocence Project picks it up. Let me know if they fail to pick it up and we'll generate some media publicity and get an attorney who loves publicity.

Sincerely,

Harry J. Bonnell, M.D.

Cc: **Texas Center for Actual Innocence**
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705

**Thurgood Marshall School of Law Innocence Project**
3100 Cleburne Street
Houston, TX 77004
Phone: 713-313-1139

B-6-7

## I. AFFIDAVIT OF HARRY J. BONNELL, M.D.

I, Harry J. Bonnell, M.D., declare as follows:

1. I am a medical doctor, currently employed as a Forensic Pathologist licensed to practice Medicine in the States of California and Washington. A true and correct copy of my curriculum vitae is attached as **Exhibit A.**

2. I attended Georgetown University Medical School in Washington, D.C., and graduated from that program in 1979. I have taught at the University of Washington, Madigan Army Medical Center, King County Corrections Center, Uniformed Services University of Health Sciences, University of Cincinnati College of Medicine, and the School of Medicine of the University of California, San Diego.

3. From 1991-2001, I was the Chief Deputy Medical Examiner for the Office of the Medical Examiner in San Diego, California. I have also been Chief Deputy Coroner and Director of Forensic Pathology of Hamilton County, Ohio, Staff Pathologist in the Forensic Sciences Department at the Armed Forces Institute of Pathology, and Assistant Medical Examiner of King County, Washington.

4. I have personally performed over 7000 autopsies and provided sworn testimony more than 585 times in the Superior Courts of twenty states, six Federal Court jurisdictions and eight military courts..

5. In preparing this affidavit, I reviewed the transcript of trial testimony of forensic analyst Rolando OCHOA given in July/August 2001 in State v. Gustavo Mireles.

6. Based on my education, training and experience, and my review of this material, it is my opinion to a reasonable degree of medical certainty that

- OCHOA's testimony was misleading and inaccurate

- His testing involved the analysis of nine loci on DNA recovered from the victim, suspect and scene materials; on some of the material, three loci

1

tested similar to the suspect and victim but not the other six. This does not, as he testified to, qualify as a "match".

- Current standards, and those utilized by the Federal Bureau of Investigation, require that 13 loci be used and that all 13 must match between the two samples to call it a "match"

- Thusly, his inaccurate testimony did not meet the requirements of forensic science in 2001 and forensic science now knows for certain that those samples would not be matched to Gustavo Mireles.

7.    I am not being reimbursed in any manner for rendering this opinion.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _10th_ day of February 2014 in San Diego, California.

_____, MD
HARRY J. BONNELL, M.D.

*Jurat*

State of California
County of ___San Diego___
Subscribed and sworn to (or affirmed)
before me on this ___10___ day of ___February___
20 _14_ by ___Harry J. Bonnell___,
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

_____
Signature                    (Notary seal)

JULIO SIMOES
COMM. #1960159
Notary Public-California
SAN DIEGO COUNTY
My Comm. Exp. DEC 9, 2015
ESI1

2

LABORATORY AND FORENSIC MEDICINE ASSOCIATES

# JOHN PLUNKETT

---

13013 WELCH TRAIL
WELCH, MINNESOTA 55089

TELEPHONE: 507-263-4022
E-MAIL: PLUNKETTJ@FRONTIERNET.NET

March 25, 2014
**Re: Your January 27, 2014 letter**


Mr. Gustavo L. Mireles
McConnell Unit
3001 S. Emily Drive
Beeville, TX 78102


Mr. Mireles:

I received your letter and the attachments, including:

1. A copy of a letter from you to Dr. Harry Bonnell, dated December 3, 2013, and Dr. Bonnell's responses, dated December 16 and December 19, 2013;
2. Partial transcripts of trial testimony by Criminalist Orlando Ochoa;
3. State's Exhibits #105 and #106, Texas Department of Public Safety Physical Evidence Submission Form and DNA Analysis;
4. A copy of evidence items #5 and #6, a bloodstain lift;
5. State's Exhibits #60 and #62, uninterpretable B&W plain-paper copies showing victim's hands;
6. State's Exhibits #103 and #104, Physical Evidence Submission Forms;
7. A letter from the Innocence Project of Texas to you, dated February 24, 2009; and
8. Media articles regarding the McAllen DPS laboratory.

I agree with Dr. Bonnell's analysis as stated in his December 16 and December 19, 2013 letters. "Positive" DNA identification requires a minimum of matches at thirteen loci, not two or three loci. "Consistent" profiles at two or three loci have little significance, other than stating that analysis at these loci does not eliminate you as a potential contributor to the source material.

Dr. Bonnell suggested that you contact the Texas Center for Actual Innocence (TCAI) and the Thurgood Marshall School of Law Innocence Project. I am familiar with both organizations and have worked with the directory of the Thurgood Marshall Project in the past. In addition, I noted that you have had corresponded with the Innocence Project of Texas (IPOT). I know the directory, Gary Udashen, personally. I encourage you to contact IPOT again and let them know that I am willing to help you. I would also contact TCAI and the Thurgood Marshall Project and send them copies of this letter. I am not familiar with 2001 Texas standards for admissibility of scientific evidence such as DNA analysis. One of the Innocence Project Attorneys will be able to help you with this issue.

Finally, I have copied the records you sent me and am returning your copies with this letter.

Sincerely,

John Plunkett, M.D.

JP:dp
Enclosures

cc via e-mail: Harry Bonnell, M.D.



# U.S. Department of Justice

## Office of Justice Programs

*National Institute of Justice*

Washington, D.C. 20531

Gustavo L. Mireles #1128895
TDCJ McConnell Unit
3001 South Emily Drive
Beeville, TX 78102

Dear Mr. Mireles:

Thank you for your letter on March 11, 2014, requesting information on DNA testing policies and procedures. Specific DNA processing policies and procedures may vary by laboratory, but publications pertaining to DNA can be found, and are available to the public, on the NIJ website through http://nij.ncjrs.gov, in particular DNA for the Defense Bar at: https://www.ncjrs.gov/pdffiles1/nij/237975.pdf.

In addition, other resources may be available through your local Innocence Project, the closest local facility is the Innocence Project of Texas, 1511 Texas Avenue, Lubbock, TX 79401, or by phone: (806) 744-6525, email address: info@ipoftexas.org.

Other DNA related materials are available on the NIJ website, including information on postconviction DNA testing at: http://www.nij.gov/topics/forensics/postconviction/welcom.htm and http://www.nij.gov/topics/forensics/postconviction/wrongful-conviction.htm.

Courtesy of the National Institute of Justice (NIJ), please find enclosed a copy of Post-Conviction DNA Testing and Wrongful Conviction and also the publication of DNA for the Defense Bar.

Sincerely,
National Institute of Justice

Enclosure:

JUNE 2012
# DNA for the Defense Bar





DNA
INITIATIVE

 

www.NIJ.gov

# DNA Basics: The Science of DNA

## Section 1: What Is DNA?

Deoxyribonucleic acid (DNA) is sometimes called a genetic blueprint because it contains all of the instructions that determine an individual's genetic characteristics. A technical explanation of DNA can be found at http://www.genome.gov/glossary/index.cfm?id=48.

### Where does nuclear DNA come from?

Our parents. All human cells with a nucleus, except gamete cells — egg and sperm cells — have DNA containing the full complement of 46 chromosomes. Each egg and sperm cell carries half of the DNA complement (23 chromosomes).

Mixing of genetic markers occurs across the DNA molecule during the formation of sperm cells and egg cells. Because of this mixing process, the DNA in all sperm cells from one man or all egg cells from one woman are not equal halves "split down the middle." Rather, each genetic characteristic has a 50% chance of presenting itself in any given egg or sperm. In humans, very few observable traits are due to inheritance of only one gene. Most observable characteristics are the result of the products of multiple genes interacting. Although actual inheritance of eye color is complex, the following example simplifies the concept of inheritance of eye color for illustrative purposes. Consider a male with brown eyes who inherited a brown eye gene (B) from one parent and a blue eye gene (b) from the other. His "eye genes" will be depicted by geneticists as Bb. (Remember this from high school biology?) Half of his sperm cells will have the B (brown) gene, and half will have the b (blue) gene. Simplistically, the color of his children's eyes will be dictated by two factors: what gene he gives them and what gene their mother gives them. If the mother likewise has brown eyes and carries a Bb profile, their children will statistically be expected to look like this: 25% BB (brown eyes), 25% Bb (brown eyes), 25% bB (brown eyes), and 25% bb (blue eyes). Each of these four profiles reflects the different possible combinations given the genetic characteristics of the original DNA of dad and mom.

### What is DNA made of?

DNA is found in the cells of all living organisms, except red blood cells. DNA is actually a combination — called a DNA sequence — of four bases: adenine, cytosine, guanine and thymine, commonly referred to as A, C, G and T (see

### Figure 1: Nucleotide Base Pairs

Source Christine Funk, Working Group Member

Figure 1). These four bases, in varying combinations, make up yeast, bananas, chickens, rice and people as well as all other living organisms.

The principle of sequence formation is not unlike the principle of the English language. The 26 letters in the alphabet (or the four bases in a DNA sequence) can be combined in various ways to make different words. "The" and "theory" have three letters in common — both in the specific letters used and the order of the first three letters. Yet the word "the" has no application to the word "theory."

Likewise, in music, there are 12 elements: seven notes (A, B, C, D, E, F and G) and five sharps or flats. Playing these notes in different combinations creates "The Flight of the Bumblebee," Pachelbel's "Canon in D" and the theme song to "Charlie Brown."

With DNA, instead of 26 or 12 elements, there are the four bases mentioned above. Just as the combination of notes dictates what the music sounds like and the combination of letters dictates the word, the combination of As, Cs, Gs and Ts dictates the type of living thing.

The DNA of all human beings is actually nearly identical. Approximately 99.9% of the sequence of As, Cs, Gs and Ts is in the exact same order. This determines common human features such as two eyes, ears on both sides of the head, and long bones in forearms and calves. Although looking at these parts of the DNA molecule might help us determine it is human DNA — rather than, say, banana DNA — it isn't helpful in distinguishing one human from another.

There are, however, places on the human DNA molecule that are different. Of the approximately 3.2 billion base pairs in the human genome, a forensic DNA-typing test looks at about 3 thousand base pairs where there are known differences between people.

## What is a base pair?

Picture the DNA molecule as a spiral staircase (see Figure 2). The bases A, C, G and T behave in a predictable pattern of matching and becoming base pairs. A base pair is simply a pair of bases.

## Figure 2: The DNA Double Helix



Double helix

Source: John Butler, National Institute of Standards and Technology.

Bases pair up to form the "steps" of the DNA molecule. The sides of the DNA molecule are made up of sugar and phosphate chains.

Our interest is in the bases themselves. Imagine straightening out the DNA molecule to make a ladder rather than a spiral staircase. Each step of the ladder is a single base pair. As indicated above, there are about 3.2 billion base pairs in the DNA molecules comprising each set of human chromosomes.

Each base pair consists of either an A matched with a T, a T matched with an A, a C matched with a G, or a G matched with a C. That's it. Those are the only four combinations of base pairs that exist. Bases that pair with each other are called *complementary bases.*

These base pairs, about 3.2 billion strong, represent a whole DNA molecule or what is referred to as nuclear DNA (nDNA). All cells in the body contain DNA, except for red blood cells, which do not have a nucleus. DNA in blood comes from the nuclei of white blood cells.

## Figure 3: DNA in the Cell



cell nucleus

Chromosome

Double-stranded
DNA molecule

Individual
nucleotides

Source: John Butler, National Institute of Standards and Technology

### Back to high school biology

Picture a chicken egg. An egg is like a cell, except that an egg's outer shell is smoother and more symmetrical than a cell's outer shell or membrane. The yolk of the egg is comparable to the nucleus of a cell. The DNA is located inside the nucleus (see Figure 3). The DNA in a single cell is over 6 feet long and is bunched up inside the nucleus of each of our nucleated cells. In order for DNA analysts to be able to conduct testing on DNA, they must remove the DNA from the other cellular material that is present, using a process called DNA extraction or *DNA isolation*.

Human traits are determined by the particular order of the bases. The first thing the order dictates is that we are human. Second, the order of the base pairs dictates all the physical traits we are born with (such as eye color, face shape, etc.). In addition, there are base pairs that do not "code" for anything and pairs whose coding functions are not yet known.

The DNA looked at in forensic science is not currently known to have any function (such as coding for eye color or the potential predisposition toward a genetically inherited disease) — except for amelogenin, which is used in forensic analysis for gender differentiation. The areas at which forensic analysts look are always found in the same spots on the same chromosomes. Each specific location is called a locus (pronounced "LOW-cuss"). The forensic science community typically uses a minimum of 13 genetic loci (plural for locus, pronounced "LOW-sigh"), referred to as the 13 core CODIS (Combined DNA Index System) loci. This enables laboratories to search profiles against other profiles already in the CODIS databank (although some laboratories test more than the 13 core CODIS loci). Throughout this training guide, references will be made to the 13 core CODIS loci.

These core CODIS loci are CSF1PO, D3S1358, D5S818, D7S820, D8S1179, D13S317, D16S539, D18S51, D21S11, FGA, THO1, TPOX, and VWA (TPOX is pronounced "T-Pox." VWA is pronounced V.W.A. Likewise, FGA and CSF are simply pronounced by their individual letters. THO1 is pronounced "Tho One," with a hard "th.").

For the "D" loci, the number following the D (which stands for DNA) indicates the chromosome on which each locus is found. D21S11, for example, is a complete name, which lawyers refer to as D21 for identification. Here "21" refers to the 21st chromosome, S corresponds to the word "single" — meaning there is only one copy of this genetic marker in the human genome, and the number following the S refers to where this locus is found on the 21st chromosome.

Each of the 13 loci was chosen because of its high degree of polymorphism, meaning that several different possible genetic types exist for each locus. By examining and identifying these differences, scientists in the laboratory can differentiate between people. To illustrate, the locations on the DNA molecule that dictate for the nose to be in the center of the face are essentially identical among us all. On the other hand, the genes that dictate the shape of one's nose are polymorphic. All you have to do is look at 10 people to know that.

At each core CODIS locus, the possible types one can have are labeled by number. At THO1, for example, the types that have been observed are 5, 6, 7, 8, 9, 9.3, 10 and 11. Generally, each person on the planet has two of these: one from mom and one from dad. These types are referred to as alleles (pronounced "uh-LEELS"). If the two alleles in a profile are identical (in other words, the person received a 5 from mom and a 5 from dad), they are homozygous. If the two alleles are different, say, a 5 from mom and an 8 from dad, they are heterozygous at that locus. Rare mutations can and do occur (see, for example, www.cstl.nist.gov/biotech/strbase/).

## Short tandem repeats (STRs)

The numbers identifying the alleles for the core CODIS loci reflect the number of repeated base pair sequences at that locus. Remember, the locus is polymorphic — it varies from person to person. The way it varies is in its length. A person who has a type 5 has a much shorter length of DNA at that locus than a person who has a type 10.

For example, at THO1, we are not just looking at the 11th chromosome; we are looking

for a pattern at a specific location on the 11th chromosome. The pattern looks like this: AATG. We know that everybody has the same AATG sequence on the DNA molecule at THO1. The difference between individuals is how many times the pattern AATG is repeated on both of their 11th chromosomes. Some people have a pattern of the four bases AATG repeated five times, and their DNA type, or allele, for that copy of their 11th chromosome would look like this if it was sequenced by bases: AATGAATGAATG AATGAATG. Other people, however, have other alleles — and the person with five repeats on one of their 11th chromosomes may have a completely different repeat on their other 11th chromosome. For example, the sequence AATG AATGAATGAATGAATGAATGAATGAATG shows the pattern of four base pairs repeating nine times. This allele type is a 9. If one additional four-base-pair pattern were repeated, the allele type would be a 10.

So what's a 9.3? Although most of the time the DNA we are looking at involves a repeating pattern of four base pairs, sometimes — 9.3 at THO1, for example — this is not the case. We already know that, at this locus, nine repeats of AATG constitute a 9 allele type and 10 repeats make a 10 allele type. A 9.3 reflects nine repeats of AATG and an additional three bases minus one of the As, ATG. If there was an additional A in the same predictable pattern, we'd call it a 10, but because some people have ATG in addition to nine repeats of AATG, an allele type of 9.3 exists.

Not every locus has the repeating pattern of AATG, but every STR locus does have a repeating pattern of base pairs that we look for to identify the allele types for that particular locus.

## How are loci of interest found?

Let's continue to use THO1 as an example. We know it is on the 11th chromosome, and we know where it is on the chromosome. In the lab, DNA test kit reagents are combined with a portion of the DNA obtained from a sample. The reagents have several jobs. One is locating the areas of interest (the loci) that we wish to test. Primers run along the strands of the DNA molecule, looking for the loci we care about. The primers then identify the DNA strand immediately before and immediately after the region of

Q  And it doesn't tell us when that happened, where it happened or how it happened; isn't that true?

A. Yes.

FOR CASES INVOLVING THE INNOCENT DEPOSIT OF DNA:

Q. The DNA test results can't tell when the DNA was left; is that correct?

A. Correct.

Q. The DNA test results can't tell you the time it was left; is that correct?

A. Correct.

Q. The DNA test results can't tell you the date it was left; is that correct?

A. Correct.

Q. The DNA test results can't tell you whether it was deposited consensually; is that correct?

A. Correct.

If defense theory favors opposing the government's claims regarding the DNA evidence — that is, if the defense theory is that the defendant's DNA is not where the prosecution says it is — then cross-examination of the government witnesses may be the primary strategy for undermining the evidence and showing the jury why they should discount it. The goal of the adversarial cross-examination should not be to spar with or outwit the expert but, instead, to systematically highlight the shortcomings of the procedures that led to the DNA report asserting that, for example, the defendant's DNA profile cannot be excluded as admissible evidence.

## Time, place, transfer and contamination

In most cases — except some sexual assault cases — analysts cannot say exactly when or under what circumstances DNA came into contact with a piece of evidence. DNA at a crime scene may have been left there days, weeks or months before the crime, or after the crime was committed. A person or object may have transferred the DNA there. If the defendant's DNA is present at the crime scene or on an object recovered from the crime scene, this does not mean with any certainty that he or she was present at the crime scene at any time. The government

analyst should concede these points easily; they may be worth exploring on cross-examination if the defense theory suggests contamination, transfer or the innocent presence of the defendant at the scene at a different point in time.

Many labs do not attempt to distinguish between vaginal and skin cells. A scientist may be able to obtain a DNA profile but not be able to testify that the source definitely was vaginal fluid or skin. Contrast this with the confirmatory tests for semen. Most of the time, scientists can confirm that the DNA profile came from sperm cells.

The defendant's DNA may have come into contact with an item of evidence through contamination. As a preliminary matter, counsel should look carefully at chain-of-custody logs for every step of the process — from the crime scene to the laboratory to the analyst's workstation, and any other movement or handling in between (including any time evidence was removed from storage and then returned). If the defendant's known DNA sample was handled on the same day as, and in particular before, an item of evidence — which the laboratory's protocols may prohibit — there may be reason to think that the defendant's DNA was transferred to the evidence through mishandling. If the defense theory is that the DNA was contaminated, counsel should proceed with caution and be prepared to elicit evidence in support, through either the DNA analyst or others who came in contact with the evidence during the chain of custody.

Under either a transfer or contamination theory, counsel will want to find a compelling way to illustrate to jurors how little DNA is required for it to register on the analyst's instrument. Depending on which DNA testing kit is used, one nanogram or less is considered to be an optimal amount of DNA for testing. Defense attorney Bob Blasier famously illustrated this concept: Hold up a packet of sugar and note that it contains approximately 1 gram of sugar. Assume the packet contains 1,000 individual granules. Confirm with the analyst that given this premise, to obtain a nanogram of sugar they would need to divide a single crystal by 1,000, and then divide one of those pieces by 1,000, and then again. Finally, the expert will agree, you are at 1 nanogram, or less than the eye can see — and that amount, or less, is all that is needed for a person's DNA profile to appear in a test result. That

amount of DNA might be transferred by a small number of skin cells that came in contact with a person or object, which later came in contact with another object. If counsel picks up a pen in the courtroom, the expert will probably agree that there is a fair chance that counsel's DNA is now on that pen by way of shed skin cells.

In short, miniscule amounts of DNA can be transferred easily. This line of cross-examination can be effective under a theory of simple transfer or contamination. Factors such as evidence packaging, handling and chain of custody are critical to developing the facts necessary to support such a theory.

## Statistics

Unless there is an opposing legal ruling, to be in compliance with the current *SWGDAM Guidelines,* a DNA analyst should be presenting a statistic to characterize the significance of a match involving DNA found on an item of evidence and someone involved with the case. In non-mixture cases — and often in distinguishable DNA mixture cases — that statistic will take the form of a random match probability, as discussed in Chapter 6, Section 7. In an indistinguishable mixture case, the statistic will likely take the form of a combined probability of inclusion (CPI), a combined probability of exclusion (CPE), also called random man not excluded (RMNE), or a likelihood ratio (LR).

One section of the adversarial cross-examination should focus on the analyst's statistical claims. It is important to dispel what is known as the *prosecutor's fallacy,* which is a common misinterpretation of the random match probability statistic. If the probability that a randomly selected individual would match the DNA profile found at the scene is 1 in 1 trillion, that does not mean that there is a 1-in-1-trillion chance that the DNA came from someone other than the defendant. It means that if a person is picked at random out of the general population, the probability that he or she will match the detected profile is 1 in 1 trillion.

The question of "What is the probability that the evidence DNA profile came from the defendant" is not one that DNA testing that is supported with a traditional random match statistical calculation can address directly; however, some laboratories now use source attribution statements in their DNA reports. A source attribution statement is used to definitively state that, to a reasonable degree of scientific certainty, this DNA profile originated from this person, or their identical twin. Source attribution testimony must actually rely on demonstration via a statistical calculation (typically in the case notes) that the obtained DNA profile meets or exceeds the value set by the lab in order to make such a statement. The defense's expert should be able to assist counsel in locating the statistical data and publications on which the lab relied to reach its conclusion and design appropriate challenge questions.

## Other genetic locations (loci)

Another potential area for cross-examination is that the inculpatory claims are being made on the basis of a finite number of genetic locations — most typically, the 13 core CODIS loci, the 15 STR loci in the Identifiler® kit, or the 15 STR loci in the PowerPlex® 16 kit — of the literally billions of genetic locations comprising the complete human DNA chain.

The entire human DNA genome for each person is unique (even identical twins). In forensic DNA testing, however, only a finite number of autosomal STR genetic markers are examined (as noted above, typically 13–15 areas). Research strongly supports that it is necessary to examine 10 or more of these areas of DNA in order to be able to distinguish between people, even those who are related (with the exception of identical twins, who will have the same autosomal STR DNA profiles). The prosecution's expert should concede that other genetic loci developed for forensic identification were not used in the current case. If the defendant was excluded at just one of those other locations, the expert would have to agree that the DNA must have originated from another person — however, the analyst did not test those other locations. Defense counsel should be aware that forensic scientists within a laboratory use whichever commercial test kit their laboratory protocols specify. Although there are a number of kits available that test for additional genetic markers beyond the 13 core CODIS loci, not all labs use the same kits.

98

# Delayed Prosecutions, Cold Case Hits and CODIS

## Section 1: Statute of Limitations Defenses

Statute of limitations legislation serves a number of purposes:

> [T]he applicable statute of limitations ... is ... the primary guarantee against bringing overly stale criminal charges. Such statutes represent legislative assessments of relative interests of the [s]tate and the defendant in administering and receiving justice; they are made for the repose of society and the protection of those who may [during the limitation] ... have lost their means of defence.[1]

> From the defendant's vantage point, there is particular "concern that the passage of time has eroded memories or made witnesses or other evidence unavailable."[2]

The following principles of law are not in dispute:

- Once the period for commencing prosecution has expired, it cannot be retroactively extended by new legislation.[3]

- This is true even in cases where DNA evidence conclusively establishes identity.[4]

- Conversely, when a legislature extends the statute of limitations for a particular criminal act before it expires, the extended period applies and no statute of limitations defense applies.[5]

The advent and success of using DNA to prove identity — particularly in sex crimes with biological material — have led to legislation changing the time period in which specified crimes may be prosecuted. In some instances, the time period has been lengthened or eliminated entirely. An extended period has been granted in cases in which DNA evidence exists and has been preserved.[6]

## Section 2: John Doe Warrants

Typically, the period of limitations is tolled when a charging document with some information about the perpetrator's identity has been properly filed. "John Doe" warrants — warrants without a known name but with some identifying information — have begun to be used, particularly in DNA cases.

The first issue is whether John Doe DNA warrants satisfy the "particularity" requirement of the Fourth Amendment or parallel provisions of state constitutions. Generic descriptions of suspects generally do not meet this standard.[7] However, courts that have considered the issue to date have found that John Doe warrants with a numeric DNA profile as the identifier meet the Fourth Amendment standard.[8]

A separate argument contends that a warrant should give notice to the perpetrator so that he or she can gather evidence and prepare to meet the charges. Clearly, a DNA-profile warrant does not give notice to the average citizen. However, the one court to consider this claim to date has rejected it.[9] This type of claim would apply only in states where the statute of limitations has been extended but not eliminated; there would be no claim of entitlement to such notice in states where the legislature has abolished a particular period for commencing prosecution.

## Section 3: Due Process

Regardless of whether the limitations period has been extended or abolished, delayed prosecution may raise due process concerns if the right to

123

present a defense has been severely compromised. The U.S. Supreme Court has explained that the Fifth Amendment requires the dismissal of an indictment — even if it is brought within the statute of limitations — if the defendant can prove that the government's delay was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense.[10]

The difficulty in applying this test is twofold. First, it requires proof of the prosecution's ill motive in delaying, unless state law is more solicitous.[11] Second, the prejudice must be substantial.[12] Nonetheless, it is an issue that warrants examination in any case where there is a significant gap between commission of the offense and commencement of actual prosecution.

## Section 4: The Databank Hit Case

### Overview of the CODIS DNA databanks

In 1990, the FBI Laboratory began a pilot project called CODIS, creating proprietary software that enabled and continues to enable federal, state and local laboratories to electronically upload, exchange and compare DNA profiles.

The Federal DNA Identification Act was enacted as part of the Violent Crime Control and Law Enforcement Act of 1995 (Public Law No. 103-322). This law authorized the FBI to establish a national DNA index for law enforcement. Since then, federal and state governments have invested significant resources toward developing and maintaining a national databank system. NDIS became fully operational in October 1998.

CODIS users predominantly access two indexes: the forensic index and the offender index.[13] The forensic index contains DNA profiles from crime scene evidence. The offender index contains DNA profiles of individuals who have been convicted of offenses defined by state or federal law. The FBI maintains the CODIS databank.

CODIS has three levels:

- NDIS — the National DNA Index System — is the highest level in the CODIS hierarchy. It enables participating labs to upload, exchange and compare qualifying DNA profiles on the national level. Profiles deemed "allowable" by NDIS are then searched against profiles from all other SDIS participating labs accepted at the national level. As of August 2010, NDIS had more than 8.7 million offender profiles and more than 330,000 casework profiles.[14]

- SDIS — the State DNA Index System — allows laboratories within each state to exchange DNA profiles. Each state has a single statewide databank — SDIS. The FBI serves as the SDIS lab for the District of Columbia. The U.S. Army Crime Lab is also an SDIS lab. Each SDIS Administrator acts as the gatekeeper for determining the acceptability, based on that state's guidelines, of profiles submitted by each of the state's LDIS labs. Profiles accepted by the SDIS Administrator can be searched against those entered by other LDIS labs in the same state. Profiles accepted by an SDIS lab will also be searched against the convicted offender and arrestee (when applicable) profiles entered by the SDIS lab. SDIS custodians can share their data with the national CODIS community by forwarding it for consideration for inclusion in NDIS.

- LDIS — the Local DNA Index System — is the databank where regional, county and municipal labs within a state enter their profiles. Bench-level DNA examiners, or the lab's designee, use CODIS software to enter DNA evidence profiles into LDIS, where they are searched against other profiles that have been entered previously by their lab. Local labs can then forward their profiles to the state level for consideration for upload. Local labs must go through their SDIS lab to get profiles into the national level of CODIS.

The three-tiered system allows state and local agencies to operate their individual databases within the confines of state laws, which vary by jurisdiction. The exchange of information within this secure system is controlled by and strictly limited to law enforcement.

CODIS allows for the entry of qualifying DNA profiles into indexes based on specimen categories. The most commonly used specimen categories are as follows:

- **Convicted offender:** DNA profiles of people convicted of a crime.

■ *Forensic:* DNA profiles developed from crime scene evidence.

■ *Arrestee:* DNA profiles of arrested persons (if state law *permits* the collection of arrestee samples).

■ *Missing persons:* DNA profiles from missing persons — either known or deduced to be known profiles from missing persons.

■ *Unidentified humans:* DNA profiles from recovered *unidentified human remains* (UHR) as well as from humans who are unable or unwilling to identify themselves.

■ *Biological relatives of missing persons:* DNA profiles voluntarily contributed by relatives of missing persons.

Other databank indexes exist (such as those that contain RFLP profiles), and the ability to enter mtDNA and Y-STR data has been added for certain specimen indexes. Federal and state laws govern access, disclosure, compatibility, expunction and penalties for unauthorized disclosure of information contained within CODIS.[15]

The DNA Identification Act of 1994, which established NDIS, also created the DNA Advisory Board (DAB) to develop standards for quality assurance. The board's work culminated with the promulgation of the first set of standards document for the forensic DNA casework analysis community, which became effective nationally on October 1, 1998, issued by the FBI director. These standards superseded the existing TWGDAM Guidelines that had previously been used as the guiding document by forensic DNA labs. A second set of standards for convicted offender databasing laboratories, which became effective on April 1, 1999, was issued by the DAB before the group disbanded on March 9, 2000. Currently, the responsibility for maintaining the *Quality Assurance Standards* (*QAS*) documents falls to the director of the FBI. Recommendations for updates are provided by the Scientific Working Group on DNA Analysis Methods (SWGDAM).[16]

To participate in NDIS, states must sign a Memorandum of Understanding verifying that the submitting laboratory is in compliance with the FBI's quality assurance standards.

Forensic DNA databanks were originally limited to samples only from adults convicted of felony sex offenses and a few other violent crimes. Databanks have now been expanded to include many other offenses as well as other classes of offenders. All 50 states, the District of Columbia, and all federal jurisdictions now require certain classes of convicted offenders to provide a biological sample for entry into a DNA database. Each jurisdiction's statute determines whether a person convicted of an offense will be required to submit a biological sample for inclusion in a DNA database. (For more information, see http://forensic.dna.gov/module9/1/.) The trend is clearly moving toward including larger categories of people, including those with misdemeanor convictions, juveniles and arrestees.[17]

CODIS contains limited information, such as a specimen identifier, the sponsoring laboratory's identifier, the initials or name of DNA personnel associated with the analysis, and the actual DNA profile. Depending on lab protocol, the specimen identifier of profiles submitted to the forensic (casework) index may identify the type of bodily fluid, whether the source is known, and/or whether the entered profile was deduced from results of mixed-sample DNA typing. CODIS does not store criminal history information or the names of convicted offenders/arrestees.

When CODIS software recognizes the same DNA profile in the forensic and offender indexes, it identifies the two profiles as a match. These matches are commonly referred to as "hits." Qualified personnel from both involved labs then analyze the reported match to either validate or refute it. This critical review of all matches is standard operating procedure and is used to ensure that a match produced by a search of the databank "makes sense." With a hit generated by a search of CODIS that involves a 13-loci match between an offender profile and a single-source evidence profile, the review process is fairly straightforward. Once both labs have agreed that the profiles do indeed match, the convicted offender lab will then research which offender corresponds to the specimen identifier in its system and will pull the corresponding sample and rerun it to confirm that the archived sample bearing the offender's name generates the same profile as the one entered into CODIS for that individual. This quality check is to ensure

*125*

that sample results were not inadvertently switched during analysis or data entry. Once the profile has been confirmed in this manner, the convicted offender lab will subsequently provide basic information regarding the offender, such as name, available Department of Corrections information, and recorded date of birth, race and sex to the casework lab. The casework sample lab will then issue a hit report to the investigating agency to notify it of the databank match. This report typically requests submission of a newly obtained buccal sample from the identified offender to the casework lab as another quality check to ensure that a DNA profile obtained from the offender does indeed match the profile generated for the evidence profile. This report should also specify that the hit information is only intended to provide potential investigative leads that must be pursued by the investigating agency. If subsequent investigation supports that the CODIS match is meaningful, this can be used as the basis for probable cause to obtain the requested biological sample from the offender.

There are times, however, when the DNA profile generated from crime scene evidence that has been entered into CODIS is a mixture of more than one person's DNA. In those cases, the analysts will still critically compare the profiles to see if the offender's profile is included as part of the mixed DNA casework profile. It is not uncommon in these circumstances for the analysts to dismiss a match proposed by CODIS as not "making sense" on the basis of analytical data. When this occurs, unless agency policy states otherwise, no hit report will be issued by the casework lab; however, all information regarding the comparison and disposition of the hit will be maintained in the corresponding case file. When the labs determine, on the basis of their review, that the analytical data support the hit, a similar process to the one noted above is followed by the offender lab to research, confirm and share offender information with the casework lab.

When a DNA profile in the forensic index matches another profile in the forensic index, crime scenes can be linked together. CODIS hits involving two casework profiles will still go through a verification process. If both labs are in agreement that the profiles match, both casework labs will typically provide hit reports to the corresponding investigating agencies. These hits enable investigators to identify repeat offenders, coordinate investigations and share leads, even across multiple jurisdictions.

## Introduction: The hypothetical databank hit case

A woman alleges that she was raped, but she cannot make an identification and the police do not have a suspect. Semen found in her vagina is typed for a DNA profile, and the profile is developed and entered into the state's DNA databank. It is compared with the profiles in the convicted offender databank, and there is a match with the defendant. The police use this hit as probable cause to ultimately take the client's DNA sample, which is then tested and compared with the evidence sample. This may result in prosecution but could result in a delayed prosecution when the following occurs:

- The testing by the lab is conducted well after the alleged incident occurs.

- The testing is conducted and the databank match occurs, but the suspect is not available to provide a sample for direct comparison with the evidence profile until later.

- The databank hit occurs in reasonably close proximity to the alleged incident; however, it takes a while for the government to build a case for prosecution.

- The databank hit occurs in reasonably close proximity to the alleged incident; however, other pending prosecutions against the defendant delay ability of the prosecution to initiate the case at hand.

This section covers some of the concerns and opportunities for defense attorneys dealing with these increasingly common "cold hit" cases.

## How to approach a CODIS or cold hit case: The basics

A "cold hit" case is generally like a "normal" DNA case, except that the government may have little to go on, other than the cold hit. Defense counsel can still use the typical defense theories that do not involve challenging the DNA evidence, such as consent, or fabrication or planting of evidence. Of course, sometimes such a defense is not the best option. In those cases,